# 24-1290-cv

## United States Court of Appeals
### *for the*
## Second Circuit

NEW YORK STATE FIREARMS ASSOCIATION, GEORGE BORRELLO,
DAVID DiPIETRO, WILLIAM ORTMAN, AARON DORR,

*Plaintiffs-Appellants,*

– v. –

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

STEPHEN R. KLEIN
BARR & KLEIN PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
(202) 804-6676

BENJAMIN BARR
BARR & KLEIN PLLC
444 N. Michigan Avenue
Chicago, IL 60611
(202) 595-4671

*Attorneys for Plaintiffs-Appellants*

 (800) 4-APPEAL • (330552)

## CORPORATE DISCLOSURE STATEMENT

The New York State Firearms Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ..................................................................... iv

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW ....................................................2

STATEMENT OF THE CASE ..............................................................3

SUMMARY OF THE ARGUMENT .....................................................8

ARGUMENT ...................................................................................9

I.     The District Court Erred in Dismissing the New York State Firearms Association for Lack of Associational Standing ...........................................10

II.    Ammunition Background Checks are Unconstitutional Under the Second Amendment and This Court Should Enjoin the Laws at Issue .....................16

     A.     The Plaintiffs Have Demonstrated a Likelihood of Success on the Merits.................................................................................17

          1.     How to Understand *Bruen*'s "Historical Analogue" Test.........18

          2.     *Bruen*'s Reliance on Professor Sunstein's Analogical Reasoning Model Clarifies the Framework for This Court......20

          3.     First Amendment Analogues Inform Second Amendment Concerns.................................................................................23

          4.     The Second Amendment Prohibits Background Checks for Every Purchase of Ammunition................................................28

5.      The Second Amendment Prohibits Government Fees for Every Purchase of Ammunition ............................................................38

6.      The Second Amendment Prohibits Licensure of Every Sale of Ammunition Between Law-Abiding Citizens ..........................41

7.      At a Minimum, New York's Ammunition Background Checks Are Unconstitutional As Applied ............................................42

B.      The Plaintiffs Have Demonstrated Irreparable Harm .........................46

C.      The Balance of Equities and the Public Interest Weighs in Favor of an Injunction ...........................................................................47

CONCLUSION ...................................................................................48

CERTIFICATE OF COMPLIANCE .......................................................50

# TABLE OF AUTHORITIES

## Cases

*A.H. by & through Hester v. French*, 985 F.3d 165 (2d Cir. 2021) ........................46

*ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)....................................24

*Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973).........................................8, 13

*Amnesty Int'l, USA v. Battle*, 559 F.3d 1170 (11th Cir. 2009) ...............................14

*Antonyuk v. Bruen*, 624 F. Supp. 3d 210 (N.D.N.Y. 2022) ...................................47

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).........................................3, 38

*Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) ................3

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547 (5th Cir. 2010).............................................................................................13

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187 (9th Cir. 2013) ...................................................14

*Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) ............46

*Buck v. Bell*, 274 U.S. 200 (1927)...........................................................................21

*Buehrle v. City of Key West*, 813 F.3d 973 (11th Cir. 2015)..................................23

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) .....................................................................................12

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)..................... 18, 23

*Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021) ......13

*Connecticut Citizens Def. League, Inc. v. Thody*, No. 23-724-CV, 2024 WL 177707 (2d Cir. Jan. 17, 2024)................................................................................13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Do No Harm v. Pfizer Inc.*, 96 F.4th 106 (2d Cir. 2024) .................................. 11, 13

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016) ..........................................................13

*Duncan v. Becerra*, 366 F.Supp.3d 1131 (S.D. Cal. 2019) .............................. 26, 37

*Duncan v. Bonta*, 142 S. Ct. 2895 (2022) ...............................................................26

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ....................................................26

*Fed. Election Comm'n v. Cruz*, 596 U.S. 289 (2022)....................................... 25, 28

*Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) 25, 36, 37

*Free Holdings, Inc. v. McCoy*, No. 23-644, 2024 WL 177447 (2d Cir. Jan. 17, 2024)....................................................................................................... 10, 11

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) .....................................................17

*Gazzola v. Hochul*, No. 23-995, 2024 WL 3014531 (U.S. June 17, 2024).............17

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ............................40

*Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525 (8th Cir. 2005) ..............13

*Huddleston v. U.S.*, 415 U.S. 814 (1974)................................................................27

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)............8, 11

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)........18

*Jefferson v. Sch. Bd. of City of Norfolk*, 452 F. App'x 356 (4th Cir. 2011) ...........13

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022)........................................................18

*Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 958 F.2d 1018 (10th Cir. 1992) ................................................................. 14

*Korematsu v. U.S.*, 323 U.S. 214 (1944) ............................................... 22

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ............................... 39

*Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965) ..................... 24

*League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155 (2d Cir. 1984) ............................................. 12

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................... 11

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014) ........... 25, 27

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .............................. 17

*Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636 (7th Cir. 2017) ..... 13, 14

*Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575 (1983) ..................................................................................... 40

*N.Y. State Firearms Ass'n v. James*, 23-CV-6524-FPG, 2024 WL 1932050 (W.D.N.Y. May 2, 2024) ......................................................................... 8

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125 (2d Cir. 2015) .................................................................................................. 15

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143 (N.D.N.Y. 2018) ................................................................................................... 15

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ............... passim

*N.Y. Times Co. v. U.S.*, 403 U.S. 713 (1971) ....................................... 33

*Near v. Minnesota*, 283 U.S. 697 (1931) .............................................. 33

*New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) ................ 47

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ........................................... 12

*North American Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d 32 (2d Cir. 2018) ...................................................................... 47

*Rhode v. Bonta*, No. 18-CV-802-BEN (JLB), 2024 WL 374901 (S.D. Cal. Jan. 30, 2024)................................................................................... 3, 34

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988)........... 24

*Scott v. Sanford*, 60 U.S. (19 How.) 393 (1856) ................................. 31

*Sixth Angel Shepherd Rescue, Inc. v. West*, 477 F. App'x 903 (3d Cir. 2012)........ 13

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................ 11

*U.S. v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ........................................ 29

*U.S. v. Daniels*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024) .................... 30

*U.S. v. Harrison*, 654 F.Supp.3d 1191 (W.D. Okla. 2023) ..................................... 31

*U.S. v. Matteo*, 718 F.2d 340 (2d Cir. 1983) .......................................... 27

*U.S. v. Miller*, 307 U.S. 174 (1939) ................................................. 18

*U.S. v. Rahimi*, 144 S. Ct. 1889 (2024)...................................... 16, 17, 33

*U.S. v. Salerno*, 481 U.S. 739 (1987)................................................ 38

*United Food & Commer. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996) .......................................................................... 14

*Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022)................................................................................... 13

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980)............... 24

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) ..................... 47

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 368 (2d Cir. 2021) .......................47

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)........................................17

*Worth v. Jacobson*, No. 23-2248, 2024 WL 3419668 (8th Cir. July 16, 2024) ......16

**Statutes**

18 U.S.C. § 922 ...............................................................................................5, 26

28 U.S.C. § 1292 .....................................................................................................1

28 U.S.C. § 1331 .....................................................................................................1

42 U.S.C. § 1983 ........................................................................................... passim

N.Y. Exec. Law § 228 ............................................................................ 1, 4, 5, 17

N.Y. Gen. Bus. Law § 898 .....................................................................................26

N.Y. Penal Law § 265.00 .........................................................................................5

N.Y. Penal Law § 265.05 .........................................................................................5

N.Y. Penal Law § 400.00 ................................................................................. 29, 30

N.Y. Penal Law § 400.02 ............................................................................. 1, 4, 17

N.Y. Penal Law § 400.03 ................................................................................ passim

N.Y. Penal Law § 70.15 ...........................................................................................5

Pub. L. No. 68-175, 43 Stat. 253 (1924).................................................................31

**Other Authorities**

114 Cong. Rec. 13647 (1968) ...............................................................................27

4 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789 (Washington Chauncey Ford ed., 1906) ...................................................................32

*Ammunition*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ammunition ...................................................29

*Analogy and Analogical Reasoning*, STANFORD ENCYCLOPEDIA OF PHILOSOPHY, June 25, 2013 https://plato.stanford.edu/entries/reasoning-analogy/ ................................................................................................35

Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741 (1993)...... 20, 21

Derek Heid, *'75% of our customers have been delayed': Ammo background checks continue to bring stores and customers issues*, WKBW BUFFALO, Sept. 25, 2023, https://www.wkbw.com/news/local-news/75-of-our-customers-have-been-delayed-ammo-background-checks-continue-to-bring-stores-and-customers-issues .................................................................44

Eric Tichy, *Local sheriff stymied in ammo purchase after new law kicks in*, NIAGARA GAZETTE, Oct. 22, 2023, https://www.niagara-gazette.com/news/local_news/local-sheriff-stymied-in-ammo-purchase-after-new-law-kicks-in/article_29afc2de-70fc-11ee-89b5-a7c6da014582.html ..........44

*Federal ruling upholds ammo checks amid ongoing lawsuit, frustrating gun shop owners*, YOUTUBE, May 5, 2024, https://youtu.be/wjQYNXtAZ1A?si=rY0DwdLU93ntv766 ...............................45

Frederick Schauer & Barbara A. Spellman, *Analogy, Expertise, and Experience*, 84 U. CHI. L. REV. 249 (2017)................................................... 20, 36

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461 (1995)........................................................................23

Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695 (2009) ........................................................................32

ix

*Pistol Permits*, Monroe County Sheriff, https://www.monroecountysheriff-ny.gov/resources/pistol-permits ...........................................................29

**Rules**

Fed. R. App. P. 4 ...........................................................................................1

**Constitutional Provisions**

U.S. Const. amend. I ...................................................................... passim

U.S. Const. amend. II .................................................................... passim

U.S. Const. amend. XIV ........................................................... 1, 17, 31

U.S. Const. art. III, § 2 ...................................................................10

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiffs New York State Firearms Association ("NYSFA"), George Borrello, David DiPietro, William Ortman and Aaron Dorr challenged the ammunition background check provisions of the New York Penal Law and New York Executive Law under the Second and Fourteenth Amendments, raising a federal question. Joint Appendix ("A") at 19; *see* N.Y. Penal Law §§ 400.02, 400.03; N.Y. Exec. Law § 228. The district court refused to enter an order for a preliminary injunction on May 2, 2024, which is an appealable interlocutory order over which this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). *See* Special Appendix ("SPA") at 1. The plaintiffs' notice of appeal of the district court's order was timely filed on May 13, 2024. A378; Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

I.    Whether the district court erred in dismissing the New York State Firearms Association for lack of standing.

II.    Whether state laws that require background checks for every purchase of ammunition are unconstitutional under the Second Amendment.

## STATEMENT OF THE CASE

The so-called "Concealed Carry Improvement Act" ("CCIA"), enacted in New York shortly after the United States Supreme Court decided the case *New York State Rifle and Pistol Association v. Bruen* and after consideration in the state legislature that can be measured in mere hours, is no stranger to this Court. 597 U.S. 1 (2022); *see, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 289–90 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024). That is because the CCIA as a whole does not improve concealed carry of firearms and inflicts new Second Amendment infringements upon New Yorkers and other law-abiding citizens, including those who seek to merely purchase ammunition in the state. This case challenges the provisions of the CCIA that require background checks for every ammunition purchase, which until very recently have never been required anywhere in the United States. *Rhode v. Bonta*, No. 18-CV-802-BEN (JLB), 2024 WL 374901, at *5 (S.D. Cal. Jan. 30, 2024) ("When [*District of Columbia v.*] *Heller* was decided, no state in the nation had ever required a background check for ammunition."); *see District of Columbia v. Heller*, 554 U.S. 570 (2008).

On September 13, 2023, the Superintendent of the New York State Police activated a statewide license and record database to perform background checks for

3

every ammunition purchase in the state, as required under the CCIA. N.Y. Penal Law §§ 400.02(2), 400.03(3); N.Y. Exec. Law § 228(7). Following its activation:

> a [licensed] dealer in firearms . . . [or] a seller of ammunition . . . shall not transfer any ammunition to any other person who is not a [licensed] dealer in firearms . . . or a seller of ammunition . . . unless:
>
> > (a) before the completion of the transfer, the licensee or seller contacts the statewide license and record database and provides the database with information sufficient to identify such dealer or seller, transferee based on information on the transferee's identification document as defined in paragraph (c) of this subdivision, as well as the amount, calibre, manufacturer's name and serial number, if any, of such ammunition;
> >
> > (b) the system provides the licensee or seller with a unique identification number; and
> >
> > (c) the transferor has verified the identity of the transferee by examining a valid state identification document of the transferee issued by the department of motor vehicles or if the transferee is not a resident of the state of New York, a valid identification document issued by the transferee's state or country of residence containing a photograph of the transferee.

N.Y. Penal Law § 400.03(3); *see* N.Y. Penal Law § 400.02(2) (essentially the same law). The law continues: "No commercial transfer of ammunition shall take place unless a licensed dealer in firearms or registered seller of ammunition acts as an intermediary between the transferor and the ultimate transferee of the ammunition for purposes of contacting the statewide license and record database[.]" N.Y. Penal Law § 400.03(7). A "'[s]eller of ammunition' means any person, firm, partnership, corporation or company who engages in the business of purchasing, selling or

4

keeping ammunition[,]" and all sellers of ammunition who are not registered firearms dealers "shall register" with the Superintendent for purposes of utilizing the statewide license and record database before selling ammunition. N.Y. Penal Law § 265.00(24); N.Y. Penal Law § 400.03(1); *see also* A47 (Chiumento Decl. ¶14). Failure to register subjects a seller to a $1,000 fine for the first offense of selling ammunition and a class A misdemeanor for the second offense, which is punishable by up to 364 days of imprisonment. N.Y. Penal Law §§ 400.03(8), 70.15(1). Licensed firearm dealers that submit a request for a background check must "pay a fee imposed by the bureau for performing such background check[,]" which is currently $2.50 for ammunition purchases. N.Y. Exec. Law § 228(5)(a); SPA2.

Until September 13, 2023, the effective date of the laws at issue, George Borrello, David DiPietro, William Ortman, Aaron Dorr, thousands of members of the NYSFA and any other law-abiding citizen could go to stores in New York and purchase ammunition for their firearms following, at most, a simple display of identification. *See* 18 U.S.C. § 922(b)(1); N.Y. Penal Law § 265.05. Ammunition purchases between friends, neighbors and acquaintances were even more permissive. Now, confronted with background checks to purchase ammunition for firearms that they legally possess because, among other things, they passed a background check—and being required to pay for the same, because the $2.50 fee is

passed on from dealers to purchasers[1]—plaintiffs Borrello, DiPietro and Ortman have declined to purchase ammunition. A12, 16 (Compl. ¶¶5-7, 22-24). That is, they would purchase ammunition in New York but for ammunition background checks. A16 (Compl. ¶¶22-24). Plaintiff Dorr attempted to purchase ammunition in two locations in Canandaigua, New York on September 14, 2023, but was unable to even undergo a background check because the system was down. A17 (Compl. ¶25). Members of the NYSFA are experiencing the same: either infringement of their Second Amendment rights by the existence of the CCIA's endless background checks and associated fees or are foreclosed from purchase by the system's frequent malfunctions. A17-18 (Compl. ¶27). Messrs. DiPietro and Ortman are prevented from even engaging in a small transaction for $8.00 worth of .22 Long Rifle ammunition, lest Mr. DiPietro be subjected to a $1,000 fine for not registering as a seller of ammunition. A17 (Compl. ¶26); N.Y. Penal Law § 400.03(7), (8).

The individual plaintiffs and NYSFA sued the Superintendent of the State Police on September 13, 2023. They filed an amended complaint on September 15, 2023, which remains the operative complaint in the matter. A10. They sought a

---

[1] Mr. Ortman's experience confirmed that the $2.50 fee is passed on to purchasers, as has most everyone else who has endeavored to purchase ammunition when the background check database is working. A16-17 (Compl. ¶24); A354 (Declaration of Frank S. Yuroshoski, Jr.); A363 (Declaration of Edward V. Jacobs); A366 (Declaration of Darrel Eckhard); A369 (Declaration of David Porrata); A372 (Declaration of John V. Ryan); A375 (Declaration of Robert David Ralyea).

temporary restraining order and preliminary injunction on the same day. *See* A21. Without briefing from the Superintendent or a hearing, Judge Frank Geraci refused to enter an order for a temporary restraining order on September 21, 2023. A35.

Over the following month, while briefing the preliminary injunction motion the NYSFA evinced further and frequent malfunctions and delays with the background check system. A347-377 (affidavits). Sworn affidavits from NYSFA members show that the system was down on September 19 (A358), September 28 (A355), October 7 (A349), October 14 (A352), October 20 (A364), October 24 (A367), and October 25, 2023 (A361), entirely foreclosing ammunition purchases. The Superintendent has not complied with the requirement under the law to formulate regulations that permit sales when there is a "temporary technological or electrical failure" of the license and record database. N.Y. Penal Law § 400.03(5). For those who have been able to submit to the database, waits for approval have lasted from three hours (A373) to three days (A370) to nine days (A376). One gun owner, after waiting nine days for approval of an ammunition purchase, was refused owing to a separate delay in a background check for a firearms purchase, amounting to "a delay for the ammunition of 25 days[.]" A376. The Superintendent claims "there has not been any significant downtime since the system went live[.]" A52.

On May 2, 2024, Judge Geraci refused to enter an order for preliminary injunction. SPA1; *N.Y. State Firearms Ass'n v. James*, 23-CV-6524-FPG, 2024 WL 1932050 (W.D.N.Y. May 2, 2024). This timely appeal of that order followed.

## SUMMARY OF THE ARGUMENT

I.      The Court should reverse the dismissal of NYSFA by the court below for lack of standing. This Court is the only appellate court that completely forecloses associational standing in cases brought under the Civil Rights Act. 42 U.S.C. § 1983. Other courts and the United States Supreme Court follow the standard three-part analysis for membership standing in Section 1983 cases. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). This is because associational standing is foreclosed under a statute only when the law abrogates or eliminates it— that is, a law need not specifically provide for it. *Contra Aguayo v. Richardson*, 473 F.2d 1090, 1099–1101 (2d Cir. 1973). Here, NYSFA has established that its members would have standing to sue in their own right, that the interests at issue are germane to the organization's purpose, and that the claims asserted and relief requested do not require the participation of individual members. This is a straightforward case in which NYSFA has associational standing.

II.     The Court should reverse the refusal of the court below to enjoin New York's ammunition background checks. The Plaintiffs established each element in support of a preliminary injunction. When considering the likelihood of success, the

8

court below correctly ruled that ammunition background checks implicate the Second Amendment but incorrectly found that the Superintendent had affirmatively proved that such regulations are analogous to historic regulation. Under *Bruen*, to determine whether or not a law is analogous a court is required to compare how the historic precedent regulated the right to bear arms and why it did so. 597 U.S. at 29. There is no comparable burden or justification in history that permits placing ammunition background checks on top of firearm background checks, firearm licensure, firearm registration and myriad other requirements already enacted under New York law. Neither does the Superintendent's offering of historic laws justify government fees for each purchase of ammunition or permit the state to require registration and background checks for occasional ammunition transactions between law-abiding citizens. At a minimum, the Plaintiffs have established that the Superintendent's use of the statewide license and record database imposes lengthy wait times on gun owners throughout New York and is unconstitutional as applied. This denial of constitutional rights is an irreparable harm that can only be remedied prospectively. The public interest and balance of equities also tip in favor of enjoining a wholly unprecedented infringement of Second Amendment rights.

## ARGUMENT

Confronted with more provisions of the CCIA, a blunderbuss law that manipulates *Bruen* and circumvents Constitutional protections, this Court should

reverse the court below and enjoin ammunition background checks, which infringe Second Amendment rights and have no historical analogue. But first the Court should remove an incorrectly placed roadblock to associational standing that has hindered civil rights litigation in this Circuit for decades.

## I. The District Court Erred in Dismissing the New York State Firearms Association for Lack of Associational Standing

The court below correctly ruled that Messrs. Borrello, DiPietro, Ortman and Dorr each have standing, and so it ruled on the merits of the Plaintiffs' motion for preliminary injunction. SPA7-10; *see infra* part II. Since these individual plaintiffs—including Mr. Ortman, who is a member of NYSFA—can account for the facial and as applied challenges in this case, it may seem superfluous to argue for NYSFA's associational standing. A12 (Compl. ¶7). But that is not so. The lower court erred in dismissing NYSFA for lack of standing and it is imperative that this Court reverse before it considers the denial of preliminary injunction to recognize a vehicle for vindicating constitutional rights that has been accepted by nearly every other federal circuit and the United States Supreme Court.

Standing is required for a federal court to have jurisdiction under the United States Constitution. U.S. CONST. art. III, § 2. "A challenge to a plaintiff's standing may be raised at any time and is not subject to the usual rules of waiver and forfeiture." *Free Holdings, Inc. v. McCoy*, No. 23-644, 2024 WL 177447, at *2 n.3 (2d Cir. Jan. 17, 2024). "'[T]he "irreducible constitutional

10

minimum" of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* at *1 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992))). An association such as NYSFA generally has standing to sue as the representative of its members when "(1) 'its members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 112–13 (2d Cir. 2024) (quoting *Hunt*, 432 U.S. at 343).

The court below summarized this case as a challenge to "the process for determining" whether one is prohibited from possessing ammunition. SPA8. NYSFA's members are injured by the ammunition background check process that is overseen by the Superintendent every time they endeavor to purchase ammunition in New York, and that may be redressed by a federal court with an injunction that halts that process. This satisfies the basic facets of standing. *See Lujan*, 504 U.S. at 560–61. For purposes of associational standing, NYSFA's members would meet all the bases of standing to sue, respectively. *See, e.g.*, A347-377 (Affidavits). Moreover, because NYSFA "advocates for the protections of the right to keep and

bear arms—codified in the Second Amendment to the U.S. Constitution and New York Civil Rights Law article II, section 4—through grassroots advocacy and engagement with New York policymakers[,]" the challenge here is germane to the organization's purpose. A12-13 (Compl. ¶8). Finally, while the litigation certainly benefits from the participation of individual NYSFA members such as Mr. Ortman and other witnesses, the claims and the relief requested do not require this participation.

It is on the last point of the associational standing analysis that the court below dismissed NYSFA, and it did so unequivocally based on this Court's precedents such as *Nnebe v. Daus*. 644 F.3d 147 (2d Cir. 2011); SPA6-7. The district court ruled that, no matter what, "organizations do not have standing to bring suits on behalf of its [sic] members under [42 U.S.C. § 1983]." SPA7. Indeed, *Nnebe* says as much. 644 F.3d at 156. This is because this Court has "'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured.'" *Id.* (quoting *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)). Members of this Court have acknowledged that it is an open question as to whether this interpretation holds. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 122–24 (2d Cir. 2017) (Jacobs, J, dissenting). Although the court below cited to this Court's ruling in *Connecticut Citizens Defense League v. Lamont*, in the most recent ruling in a case brought by that very same

league this Court equivocated, "assuming arguendo" that the organization had associational standing and instead ruling on mootness. SPA7 (citing 6 F.4th 439, 447 (2d Cir. 2021)); *Connecticut Citizens Def. League, Inc. v. Thody*, No. 23-724-CV, 2024 WL 177707, at *3 (2d Cir. Jan. 17, 2024).

This Court's precedent dates to 1973. *Aguayo v. Richardson*, 473 F.2d 1090, 1099–1101 (2d Cir. 1973). Although the Court tersely reasoned in *Aguayo* that "[n]either [the] language nor the history . . . suggests that an organization may sue under the Civil Rights Act for the violation of rights of members", other courts have found just the opposite. *Id.* at 1099. Indeed, no other circuit has foreclosed Section 1983 lawsuits on behalf of an organization's members and most have found associational standing—or, at least, considered it—under the standard analysis utilized recently by this Court in the *Do No Harm* case. 96 F.4th at 112–13; *see, e.g.*, *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *Sixth Angel Shepherd Rescue, Inc. v. West*, 477 F. App'x 903, 909 (3d Cir. 2012); *Jefferson v. Sch. Bd. of City of Norfolk*, 452 F. App'x 356, 358 (4th Cir. 2011); *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550–54 (5th Cir. 2010); *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034–37, 1039–40 (6th Cir. 2022); *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639–40 (7th Cir. 2017); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 532–33 (8th Cir. 2005); *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California*

13

*Dep't of Transp.*, 713 F.3d 1187, 1194–95 (9th Cir. 2013); *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 958 F.2d 1018, 1021–23 (10th Cir. 1992); *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1178 (11th Cir. 2009). The Seventh Circuit, relying on Supreme Court precedent, found that "[t]he first two prongs of this [associational standing] test arise from Article III, and the third prong is prudential, meaning it may be *abrogated or eliminated* by statute." *Milwaukee Police Ass'n*, 863 F.3d at 640 (citing *United Food & Commer. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)) (emphasis added). Rather than requiring a law such as Section 1983 to provide associational standing, other circuits have found that the prudential doctrine is more permissive: that is, although statutes may authorize jurisdiction, that is not required and courts should only foreclose associational standing under a statute when it is specifically eliminated or abrogated. *See also United Food*, 517 U.S. at 558. Section 1983 does not do that, so this Court should consider the third prong of the associational analysis and find that NYSFA has standing on behalf of its members.

The claim in this case is that ammunition background checks violate the Second Amendment. A19. Facially, NYSFA argues that ammunition background checks and fees are unconstitutional under any circumstances. *See infra* part II(A)(1), (2), (3). As applied, NYSFA argues that, even if instant background checks for ammunition purchases are permissible, the frequent delays, outages and other

14

malfunctions of New York's system leave the law unconstitutional. *See infra* part II(A)(4). The relief requested is strictly for declaratory and injunctive relief that would halt these background checks. A19 (Compl. Prayer for Relief). NYSFA is not seeking monetary damages—nor is any plaintiff in this case. The harms to NYSFA's members are the same, and the relief NYSFA seeks on their behalf is uniform. Such claims and requested relief do not require the individual participation of dozens, hundreds, or thousands of other NYSFA members. Even in the as applied claim, the delays and malfunctions of the license and record database can be evinced through third parties such as firearm dealers and discovery from the State Police. So, this case fits squarely into this Court's other rulings that have recognized associational standing. *See, e.g.*, *N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 130–31 (2d Cir. 2015).

One cannot address this question of associational standing without a measure of humor, particularly in a Second Amendment matter. Only two years ago, in *Bruen* the Supreme Court reversed this Court's ruling over a challenge brought against a New York statute under Section 1983 by the New York State Rifle and Pistol Association on behalf of its members. 597 U.S. at 71; *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143, 145–147 (N.D.N.Y. 2018) (noting the case was brought under Section 1983 and the association's "failure to allege any institutional injury"). To suggest that the organization had no standing—an

unwaivable condition—yet ended up on the caption of a controlling case for this matter (indeed, the most important Second Amendment decision since *Heller*) is confounding, even as dicta. What differentiates the NYSFA from the New York State Rifle and Pistol Association for purposes of standing in these kinds of cases? Nothing. *See also Worth v. Jacobson*, No. 23-2248, 2024 WL 3419668, at *3–*4 (8th Cir. July 16, 2024) (upholding the associational standing of the Second Amendment Foundation, the Firearms Policy Coalition, Inc., and the Minnesota Gun Owners Caucus).

This Court should revisit its prior rulings and permit associational standing in Section 1983 cases, address Section 1983 actions under the typical associational standing analysis and rule that NYSFA may present the claims in this case on behalf of its members.

## II.  Ammunition Background Checks are Unconstitutional Under the Second Amendment and This Court Should Enjoin the Laws at Issue

When a regulation on the right to bear arms has never been done before, the government cannot establish it is part of the historical tradition of firearm regulation, so it must present something close enough to it. *U.S. v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). Here, the government has not and cannot do so: ammunition background checks are a modern invention with no historical analogue.

The NYSFA and individual plaintiffs have established each element for a preliminary injunction:

> "A plaintiff seeking a preliminary injunction must establish that he [1] is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

*Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023), *cert. denied,* No. 23-995, 2024 WL 3014531 (U.S. June 17, 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). This Court should reverse the court below and enjoin mandatory background checks of ammunition purchases. N.Y. Penal Law §§ 400.02, 400.03; N.Y. Exec. Law § 228.

## A. The Plaintiffs Have Demonstrated a Likelihood of Success on the Merits

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. This applies to New York State via the Fourteenth Amendment. U.S. CONST. amend. XIV; *see McDonald v. City of Chicago*, 561 U.S. 742, 767–78 (2010). "[T]he Amendment's text '"guarantee[s] the individual right to possess and carry weapons in case of confrontation."'" *Rahimi*, 144 S.Ct. at 1907 (Gorsuch, J., concurring) (quoting *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 592)).

New York's ammunition background check system flips Second Amendment jurisprudence on its head. Instead of "presum[ing] that individuals had a right" to

17

purchase arms, New York treats everyone, even those who have already passed a firearms background check and registered and licensed their firearms, as a suspicious person subject to ongoing background checks every time they purchase ammunition. *Bruen*, 597 U.S. at 56. That is, law-abiding citizens must overcome a presumption against ammunition ownership again and again through the Superintendent's license and record database. It is high time to set straight New York's wayward approach to Second Amendment jurisprudence.

### 1. How to Understand *Bruen*'s "Historical Analogue" Test

The right to keep and bear firearms for protection "implies a corresponding right" to obtain ammunition. *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022) (vacated on other grounds); SPA11-12. Just as infringements of the First Amendment may occur "at different points in the speech process[,]" Second Amendment infringements may occur at different points in the self-protection process. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336–37 (2010); *see* U.S. CONST. amend. I. As stated by the Ninth Circuit, "without bullets, the right to bear arms would be meaningless." *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *see also U.S. v. Miller*, 307 U.S. 174, 180 (1939). Per *Bruen*, the "Constitution presumptively protects that conduct." 597 U.S. at 24.

This Court's task is to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at

26. This requires an examination of the law's justification explained during the relevant time period. *Id.* at 41–42. It is not a license to embrace modern *post-hoc* conjecture. *Id*.

New York's ammunition background check system elevates the New York Legislature's assumption that every citizen is presumptively an unfit, dangerous citizen over the constitutional guarantee of the Second Amendment. Under such an approach, any legislative body would have freewheeling discretion to determine just whom unfit or dangerous people may be—Native Americans and wayward Protestants in the not-so-distant past—and disarm them. Yet, this is the inverse of the constitutional guarantee in controversy. "A constitutional guarantee subject to future judges' [or legislative] assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. That is, any means-end interest balancing about the scope of the Second Amendment was conducted by the people at the ratification of the Bill of Rights. This Court's role is limited here—to examine whether the state has carried its burden in evincing historical support for its challenged laws.

*Bruen* requires that any court addressing a challenge under the Second Amendment ask if the conduct is truly covered by its scope. 597 U.S. at 17. Where that question is answered in the affirmative, the "Constitution presumptively protects that conduct." *Id.* The burden then shifts to government to "prove that its firearms

regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. When the government is able to prove a "well-established and representative historical analogue" a court may conclude that the activity "falls outside of the Second Amendment." *Id.* at 30, 17 (internal quotations and citations omitted).

### 2. *Bruen*'s Reliance on Professor Sunstein's Analogical Reasoning Model Clarifies the Framework for This Court

Due care must be given to the relevancy and rigor of the historical analogues employed by government to support its firearms restriction. *Id.* at 29–30. And much of this case requires measuring whether the historical analogues cited by the Superintendent are "relevantly similar." *Id.* at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)); *see also* Frederick Schauer & Barbara A. Spellman, *Analogy, Expertise, and Experience*, 84 U. CHI. L. REV. 249, 254 (2017) ("A green hat is similar to a green truck in its greenness, for example, but dissimilar in a host of other ways.").

*Bruen* instructs that the "relevantly similar" analysis should be grounded in two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. When deciding "how" a law burden's Second Amendment rights, courts analyze whether the proposed analogue imposes a "comparable burden." *Id.* As to deciding "why" under *Bruen*, courts ask whether the "burden is comparably justified." *Id.*

While a perfect historical twin is not required, historical analogues must be well-established and representative, lest they "endors[e] outliers" and muddy the constitutional comparisons. *Id.* at 30. The Supreme Court relied on Professor Sunstein's work, *On Analogical Reasoning*, to help shape *Bruen*'s test. *Id.* at 29. Professor Sunstein observes how easy it is to engage in spurious classification or other forms of bad formalism in analogic reasoning. 106 HARV. L. REV. at 756–57. Such an example can be found in Justice Holmes's infamous opinion in *Buck v. Bell* in favor of compulsory sterilization. 274 U.S. 200, 207 (1927). Problematically:

> Holmes suggested that if people can be conscripted during wartime, or can be forced to obtain vaccinations, it follows that the state can require sterilization of the "feeble-minded." But this is a casual and unpersuasive claim. Many principles may cover the first two cases without also covering the third. Holmes does not explore the many possibly relevant similarities and differences among these cases.

Sunstein, 106 HARV. L. REV. at 757. It is of the utmost importance to employ the appropriate analogical test given *Bruen*'s call for courts to assess historical laws in Second Amendment jurisprudence.

A typical error in analogical reasoning is to resort to inappropriately high levels of generality without conducting a rigorous examination of: (a) differences between cited examples or (b) low to intermediate level principles that may describe differences between example sets. *Id.* Thus, a state's burden in establishing an appropriate historical analogue must be rigorous. Here, the Superintendent's reliance

on antiquated laws that mistreated Catholics, dissident Protestants and ethnic or racial minorities as permission to mistreat law-abiding gun owners today is misplaced reliance based on high levels of generality that does not carry the state's burden to uphold the laws at issue. That is, New York's laundry list of moribund, unsupportable laws falls short of making a case demonstrating an "enduring American tradition" of "relevantly similar" laws. *Bruen*, 597 U.S. at 68, 29.

The Superintendent's reliance on racist, xenophobic, outdated historical examples is both shocking and analogically inappropriate. A80-127. It is shocking because their usage would be like courts embracing *Korematsu* as a standard bearer today to analyze racial discrimination. *Korematsu v. U.S.*, 323 U.S. 214 (1944). It is analogically inappropriate because, as discussed by Professor Sunstein, the analogy lifts itself to a high level of generality without examining differences between the systemic disarmament of minorities against New York's ammunition background check scheme. These differences give rise to the conclusion that, like Justice Holmes's opinion in *Buck*, the lower court relied on inappropriately high levels of generalization in examining historical analogues. That is, the state carries the burden of showing the "how" and "why" to support its analogical comparisons and they must be similar both in type and justification. *Bruen*, 597 U.S. at 29–30. Because of this failure, the lower court's opinion should be reversed and the law enjoined as facially violative of the Second Amendment.

### 3. First Amendment Analogues Inform Second Amendment Concerns

It is appropriate to draw upon First Amendment analogues when reviewing Second Amendment claims. *Heller*, for example, repeatedly compared the right to keep and bear arms with the freedom of speech in the First Amendment. 554 U.S. at 582, 595, 606, 634–35; *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480–81 (1995) ("franchise and the right to arms were 'intimately linked' in the minds of the Framers and of prior and subsequent republican thinkers."). Specifically, First Amendment jurisprudence offers a well-developed body of caselaw analyzing antecedent burdens imposed against free speech rights that should be considered in Second Amendment claims such as those challenged here. Because it is tempting to believe that a supposedly simple background check really inflicts little to no burden, an analysis of corresponding First Amendment caselaw is helpful. *See Heller*, 554 U.S. at 595, 635 (expressly approving the comparison of the Second Amendment to the First Amendment).

The Supreme Court has consistently protected all elements of creation of the "speech process." *Citizens United*, 558 U.S. at 339. Were it so that the First Amendment did not protect the antecedent acts giving rise to the free flow of ideas, government would be free to "proceed upstream and dam the source" of speech. *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015); *see also ACLU of*

23

*Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (failure to protect antecedent speech acts would make resulting publication utterly ineffective). This same concern holds true for antecedent acts giving rise to effective self-defense.

Even incidental, antecedent burdens on speech trigger serious constitutional review. In *Lamont v. Postmaster General of the United States*, the Postal Service halted any mail deemed to be "communist political propaganda" until a postal recipient affirmed that he wanted it delivered. 381 U.S. 301 (1965). From the government's perspective, little burden was placed on speech rights—after all, all a recipient had to do was affirm he wanted certain mailings approved. But even this incidental imposition on speech rights was ruled unconstitutional given that it required an "official act" for a constitutional right to be realized. *Id.* at 305.

Charitable solicitation cases like *Riley v. National Federation of the Blind*, which invalidated reasonable fee rule imposed on charities, also stand for the proposition that even seemingly minor antecedent burdens matter. 487 U.S. 781, 791 (1988). *Village of Schaumburg v. Citizens for a Better Environment* holds similarly. 444 U.S. 620 (1980). There, the Supreme Court invalidated a local ordinance prohibiting door-to-door solicitations from charities not using at least seventy-five percent of their funds for "charitable purposes." *Id.* at 624, 639. Such antecedent rules burdened just how charities would later exercise their free speech rights, violating the First Amendment.

24

Relevant to the second *Bruen* factor that asks "why" a burden is needed, First Amendment jurisprudence instructs that courts should be careful in accepting precautionary or too-far-removed prophylactic government interests. *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 479 (2007). In *Wisconsin Right to Life*, the Federal Election Commission expanded the reach of its regulations to capture more speech because it was concerned that protected speech might "circumvent" other rules guarding against less-protected speech. *Id.* But the Supreme Court cautioned that government rules based on a "prophylaxis-upon-prophylaxis" interest is not consistent with strict scrutiny. *Id.* Similarly, the Supreme Court struck down aggregate contribution limits in *McCutcheon v. Federal Election Commission*. 572 U.S. 185, 221 (2014). There, the Court ruled that base contribution limits were themselves prophylactic measures against corruption and any aggregate limitation was simply another government attempt to rely on a "prophylaxis-upon-prophylaxis" interest. *Id.* In such an instance, courts should be "particularly diligent" in scrutinizing the law. *Id.*; *see also Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 291 (2022) ("Such a prophylaxis-upon-prophylaxis approach . . . is a significant indicator that the regulation may not be necessary for the interest it seeks to protect.").

This well-settled approach to prophylactic interests in First Amendment jurisprudence has also seen some application in Second Amendment cases. In

*Duncan v. Becerra*, a district court invalidated California's statute prohibiting firearm magazines beyond a certain capacity based, in part, on the government's reliance on prophylactic interests. 366 F.Supp.3d 1131, 1159, 1173, 1180 (S.D. Cal. 2019). An en banc panel of the Ninth Circuit reversed that opinion, *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), only to have the judgment vacated and case remanded by the Supreme Court. *Duncan v. Bonta*, 142 S. Ct. 2895 (2022) (memorandum opinion). Important to that case is the realization here—that the state's approach to treat each law-abiding citizen as a dangerous or suspect individual "turns the Second Amendment on its head." *Duncan*, 366 F.Supp.3d at 1173 (internal quotations and citations omitted).

New York maintains a sprawling, prophylactic system of firearms registration and regulation addressing public safety concerns. New York law requires a National Instant Criminal Background Check System ("NICS") check by a licensed firearms dealer prior to any transfer, sale, exchange, or disposal of a firearm, except between immediate family members. N.Y. Gen. Bus. Law § 898(1). Federal law reiterates this requirement in requiring that a NICS check be performed at every point of firearms sales. 18 U.S.C. § 922(t). The Superintendent has taken over this effort as a middleman with the statewide license and record database under the statutes at issue here.

Both New York and federal law ensure that firearms background checks are grounded in the purpose of preventing dangerous individuals from possessing weapons. Like individual contribution limits in *McCutcheon*, a firearms background check is *itself* prophylactic in hoping to prevent against future harm. *U.S. v. Matteo*, 718 F.2d 340, 341 (2d Cir. 1983) (describing firearms background checks as prophylactic in nature). Legislative history acknowledges that Congress passed the Gun Control Act of 1968 to advance this prophylactic interest. *Huddleston v. U.S.*, 415 U.S. 814, 829 (1974) (citing 114 Cong. Rec. 13647, 21784 (1968)). At this first level of prophylactic concern, courts have generally upheld governmental power to conduct background checks for firearms purchases.

A constitutional and analytical problem occurs when government moves to impose not a first-level restriction on Second Amendment rights, such as a firearms background check, but secondary, ongoing background checks for ammunition. If government has first moved to advance a prophylactic interest in upholding public safety, then continuing, duplicative restrictions against Second Amendment rights necessitate "particular[] diligen[ce]" in examining the validity of that secondary restriction. *McCutcheon*, 572 U.S. at 221. That is, New York's reliance on a prophylaxis-upon-prophylaxis interest in public safety by regurgitating and repeating its already preventative background check system should meet with heightened suspicion here. As is recognized in the First Amendment context, this

27

prophylaxis-upon-prophylaxis is a "significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 596 U.S. at 291. Combined with *Bruen*'s call for special attention to employing appropriate historical analogues, New York's ammunition background check regime is plainly unconstitutional.

### 4. The Second Amendment Prohibits Background Checks for Every Purchase of Ammunition

Firearms are useless without ammunition. This, the court below acknowledged, provides the basis for protecting the right to keep and bear ammunition just like the right to keep and bear the arms that use it under the Second Amendment. SPA11-12. This constitutional protection notwithstanding, there are distinctions between firearms and ammunition that foreclose analogizing historic laws that govern firearms acquisition by law-abiding citizens with wholly modern laws that govern ammunition acquisition by law-abiding citizens, especially when those checks are done in addition to existing regulations on firearms acquisition. *Contra* SPA11 (suggesting a distinction "would clearly put ammunition beyond the protection of the Second Amendment."). Ammunition background checks have no historic analogue and are unconstitutional under the Second Amendment. *See Bruen*, 597 U.S. at 19–20 (when the Second Amendment applies, "the government must *affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." (emphasis added)).

28

Most firearms, with proper care, can serve for generations. But ammunition is disposable. Most modern cartridges contain a primer, propelling charge, and projectile. *See Ammunition*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ammunition [https://perma.cc/MDE7-X6CC]. Though many cartridges can be reloaded, most gun owners use ammunition once and then purchase new ammunition made by a manufacturer. Gun owners need to acquire it commercially from time to time, and they do so having already proven they are *not* part of the narrow class of individuals who have lost their Second Amendment rights, such as felons: that is, by passing a background check to get the firearm in the first place. *See, e.g.*, A16-17 (Compl. ¶¶22-25). Moreover, in New York, licensure is also required to own a pistol—with its own separate fees—and one must register most firearms with the state. N.Y. Penal Law § 400.00(2), (16-a); *see, e.g.*, *Pistol Permits*, MONROE COUNTY SHERIFF, https://www.monroecountysheriff-ny.gov/resources/pistol-permits [https://perma.cc/SHR2-N3CQ] *see also* A17-18 (Compl. ¶¶22-25) (three out of four individual plaintiffs sought ammunition for pistols).

These distinctions made no difference to the court below. The court ruled that ammunition background checks are constitutional because "dangerous individuals may be restricted from owning or possessing a firearm without violating the Constitution." SPA13 (citing *U.S. v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023), *cert.*

*granted, judgment vacated,* No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024)). Moreover, the government may "employ mechanisms to 'ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.'" SPA14 (quoting *Bruen*, 597 U.S. at 38, n.9). The court found that ammunition background checks are such a mechanism, historically analogous to loyalty oaths as "pre-purchase burdens employed to confirm" that purchasers are not dangerous. SPA14. Thus, the government may implement triggers for this mechanism that operate again, and again, and *again*, lest one become akin to a Catholic or a dissident Protestant in the meantime. SPA15-16; *see* A80-127 (Superintendent Exh's 7-14), A128-153 (Exh's 15-17).

The background check for the purchase of a firearm occurs once. Renewals for firearms registration and licensure in New York vary but are generally five years. *See* N.Y. Penal § 400.00(10)(b), (16-a). The latter are already an increase from, for example, a one-time loyalty oath, but at least has a temporal limitation and arise at fixed points in time. *Contra* SPA14. Ammunition background checks endure after one legally purchases, registers and/or licenses a firearm, attaching to every purchase of ammunition for firearms for which the owner has already been cleared. This is not an analogue.

The Superintendent's reliance on racist, outdated, and xenophobic restrictions bears little weight for conducting the appropriate historical analogue test under

*Bruen.* A80-127. When addressing historical sources, "not all history is created equal." *Bruen*, 597 U.S. at 34. Constitutional rights are "'enshrined with the scope they were understood to have *when the people adopted them.*'" *Id.* (quoting *Heller*, 554 U.S. at 634–35) (emphasis added). Relevant historical markers include dates of the adoption of the Second and Fourteenth Amendments in 1791 and 1868. Historical evidence that "long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* The historical shelf life of New York's cited laws is thus disqualifying. In *Bruen*, the Court gave virtually no weight to the evidence of long-historic Colonial American restrictions on arms. *Id.* The Superintendent's reliance on pre-Founding Era laws carry correspondingly little weight here. *See* A80-127.

Just the same, the Superintendent's reliance on restrictions made applicable to Native Americans offers no insight whatsoever into the constitutionality of New York's never-ending ammunition background checks. Native Americans were not understood to "be a part of the 'political community' of persons protected by the Second Amendment." *U.S. v. Harrison*, 654 F.Supp.3d 1191, 1216 (W.D. Okla. 2023) (citing *Scott v. Sanford*, 60 U.S. (19 How.) 393, 404 (1856)). It was only with the Indian Citizenship Act of 1928 that Native Americans were granted full citizenship. Pub. L. No. 68-175, 43 Stat. 253 (1924). Restrictions on their right to

bear arms before that (that is, every law the Superintendent offers) are thus irrelevant to the question before this Court. *See* A80-105, 117-120.

The Superintendent's further reliance on sources that restricted arms and ammunition ownership for Catholics or loyalists is also problematic. A112-116, 121-153. The disarmament of Catholics or loyalists was connected to the theory that these people were inherently untrustworthy, and this disarmament was part of a wholesale eradication of a distrusted group's civil liberties. A guiding principle of the American Revolution held that Tories simply had no civil liberties. C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 725 (2009) (internal quotations and citations omitted). Colonies regularly violated what would come to be the First, Fourth, and Fifth Amendment rights of untrustworthy or dangerous groups. They also disarmed people in violation of what would become the Second Amendment—all predicated on colonial policy preferences that these people were inherently untrustworthy or dangerous.

The Superintendent's other exhibits reference Revolutionary War era loyalty oaths, such as the recommendation by the Continental Congress that individuals be disarmed unless they swore such an oath. A128-153; *see* 4 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789 at 205 (Washington Chauncey Ford ed., 1906). These are common in Massachusetts, Virginia, and Pennsylvania statutes of the time.

Thus, three of thirteen colonies appear to have employed loyalty oath disarming provisions—hardly a majoritarian trend.

The use of loyalty oaths in three colonies has limited application. Disarmament may occur when a person, if armed, would pose a genuine threat of immediate danger to others. *See Rahimi*, 144 S.Ct. at 1901 (people presenting a "special danger of misuse" may have firearms rights restricted). Oaths and wide-ranging checks are unusual, not ordinary, examples.[2] To the extent the three colonial laws reflect a broader historical analogue, it is for the unsurprising proposition that in war time or times of domestic unrest civil liberties may be diminished. This, again, parallels First Amendment jurisprudence. *See, e.g.*, *N.Y. Times Co. v. U.S.*, 403 U.S. 713, 726 (1971) (Brennan, J., concurring) (First Amendment liberties remain protected during war time except for the most guarded governmental information, such as troop locations); *Near v. Minnesota*, 283 U.S. 697, 716 (1931). Suffice it to say, New York is not in a time of war or domestic unrest.

The Superintendent's batch of historical sources are too distant to be relevant and relate to antiquated laws that denied fundamental civil liberties, often to

---

[2] And this is the constitutional rub. *Rahimi* affirms that, in exceptional circumstances with due process rights observed, dangerous people may be disarmed or subject to additional vetting. 144 S.Ct. at 1901. But it does not stand in support of New York's upside-down approach to the Second Amendment—that everyone, everywhere, in every instance is likely dangerous and must undergo secondary background checks each time they purchase ammunition.

oppressed groups. They rely on special conditions applicable to historically distrusted groups that, thankfully, no longer reflect America. They apply only in exceptional circumstances to limited groups of people, not to every would-be purchaser of ammunition. They are not alike.

The examples cited are not an appropriate basis upon which to analyze the constitutional propriety of New York's never-ending background checks for ammunition purchases. In short, like *Buck*, the Superintendent and court below use poorly-correlated laws to support a principle of high generality—that government may impose restrictions based on "dangerousness." SPA13. New York's ammunition background check system elevates the legislature's policy assumption that every citizen is likely an unfit, dangerous citizen over the constitutional guarantee of the Second Amendment. As it remains, and as one other court noted, a background check required each time ammunition is purchased was never enacted until California's very recent effort. *Rhode*, 2024 WL 374901 at *5. The Superintendent must do better than this to meet his burden in sustaining New York's ahistorical approach to ammunition regulation under *Bruen*.

As *Bruen* instructs, and as related First Amendment caselaw affirms, attention to the interest advanced here—*Bruen*'s "why" inquiry—and corresponding fit should be considered. The Superintendent posits that laws targeting wayward Protestants and minorities for disarmament permit checks of everyday law-abiding

citizens for ammunition purchases today. But the Superintendent and court below fail to address other reasons why these laws may have existed for particular classes and may not be readily applicable here. That is, low and intermediate principles (more simply: apparent differences and rules of analogical reasoning) readily distinguish them from New York's unprecedented ammunition background checks.[3]

Each of the Superintendent's examples were born of exceptional circumstance. Loyalty concerns were present, wartime emergencies were pressing, and allegiances of minority racial or religious groups were troubling to majoritarian interests. Thus, *Bruen*'s call to examine the "why" prompting regulation speaks to an entirely different set of incomparable circumstances not present here. True enough, at a high enough level of generality, these concerns are grounded in worries about dangerousness. But because important low and intermediate level principles distinguish their existence, they should not be found to be historically analogous. It

---

[3] Among many textbook-style guidelines for evaluating the strength of analogical reasoning comparisons, several prove helpful here: (1) analogies involving more similarities between two comparative domains are stronger; (2) analogies involving more differences between the two offer weaker proof; (3) analogies involving causal relations are more plausible than those not involving them; (4) the relevance of the similarities or differences should have a weighted effect in the analysis; and (5) analogies offering multiple analogical examples of similarity supporting the same conclusion are stronger. *See Analogy and Analogical Reasoning*, STANFORD ENCYCLOPEDIA OF PHILOSOPHY, June 25, 2013, https://plato.stanford.edu/entries/reasoning-analogy/ [https://perma.cc/AYV7-QK4N]

remains the Superintendent's burden to have established an historic analogue under *Bruen* and his failure to do so requires reversal of the court below.

There are also important concerns about *Bruen*'s "how" because the cited examples are particularly focused to narrow groups during exigent times. They do not apply broadly to every law-abiding purchaser of ammunition. And existing law already provides for, among other things, firearm background checks by state and federal law to achieve a prophylactic safety interest. A critical analysis of the "how" thus demonstrates that historical laws targeted particular groups of people in extraordinary circumstances. Yet, New York's law already has, among myriad other regulations, a firearm background check in place, making its application to ammunition purchases unnecessarily duplicative—an impermissible prophylaxis-upon-prophylaxis approach. *See Wisconsin Right to Life, Inc.*, 551 U.S. at 479. And New York's approach is anything but exceptional or targeted. It applies to every law-abiding citizen and requires them to undergo background checks with each ammunition purchase only to be granted through an official act of the state. Apples and oranges, as it were.

"A green hat is similar to a green truck in its greenness, for example, but dissimilar in a host of other ways." Schauer & Spellman, 84 U. CHI. L. REV. at 254. The Superintendent's offering of historical laws focus on prohibiting dangerous people from obtaining arms at some hasty level of generalization, just as a green

truck and a green hat are superficially similar. But that is not enough for the Superintendent to carry his burden under *Bruen*. Because the laws in question are outdated, focus on extraordinary circumstances and apply to limited classes of people they are inappropriate support for New York's always-applicable, never-ending ammunition background check system. The lower court's failure to properly conduct *Bruen*'s historical analogue test supports reversal and the entry of injunctive relief.

In First Amendment caselaw, when the government moves to advance far-removed, prophylactic interests, like additional contribution limits on top of existing contribution limits, this triggers serious constitutional concerns. In this challenge triggering Second Amendment concerns, the same realization should occur, particularly per the "how" discussed in *Bruen*. Grasping a far-removed interest in protecting against dangerous individuals obtaining firearms, New York turns the Second Amendment on its head. The state already has a slew of firearms public safety laws in place. Its secondary, never-ending ammunition background checks simply treat average, law-abiding citizens, such as the Plaintiffs, as suspect, dangerous people who must receive the official blessing of the state to obtain ammunition. For this, New York lacks authority. *Wisconsin Right to Life*, 551 U.S. at 474–75; *Duncan*, 366 F.Supp.3d at 1172–73. Plaintiffs ask that this Court set the

Constitution right side up and reverse the court below in its denial of injunctive relief.

The Plaintiffs have "establish[ed] that no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). With no historical analogue, ammunition background checks are invalid in all applications, especially on top of existing firearm background checks, registration and licensure requirements in New York that have not been challenged in this suit and would remain in force following an injunction. The analogous provision to these portions of the CCIA are within the CCIA itself, particularly the law's attempt to use historic restrictions on carrying firearms in sensitive places as justification to turn just about everywhere into a sensitive place. *Antonyuk*, 89 F.4th at 333–79. Ammunition background checks are unconstitutional.

### 5.    The Second Amendment Prohibits Government Fees for Every Purchase of Ammunition

The crux of this challenge is that New York lacks authority, *ab initio*, to conduct its ahistorical ammunition background checks. Enjoining the enforcement of the laws at issue will, of course, eliminate the collection of the $2.50 fee for each background check. Yet, separately, the fee is unconstitutional because it has no historical analogue.

The court below relied on *Kwong v. Bloomberg* and concluded that "'imposing fees on the exercise of constitutional rights is permissible when the fees

are designed to defray (and do not exceed) the administrative costs of regulating the protected activity.'" SPA18 (quoting 723 F.3d 160, 165 (2d Cir. 2013)). It ruled that "*Bruen* did not alter this settled principle[.]" SPA19 (quoting 597 U.S. at 38 n.9). But *Kwong* was decided on means-end scrutiny analysis, which was overturned in *Bruen*. *Kwong*, 723 F.3d at 167–69; *Bruen*, 597 U.S. at 19. *Kwong* entertained that fees can implicate the Second Amendment, and here that is plain enough: if one does not pay the fee for the ammunition background check, the seller probably will not submit it. It is thus the government's responsibility to affirmatively prove that fees such as this were historically placed on ammunition acquisition.

The Superintendent offers mostly license fees, taxes and inspection fees on importers, dealers and manufacturers as analogues. A154-184, 217-229, 247-279, 283-330. It is certainly likely that all of these trades incorporated those costs into their prices and passed them on to purchases. That is all those laws have in common with the background check fee. General taxes and licenses are not analogous to fees for a regime that monitors every customer of a certain product. This is but again the broadest level of generalization that comports with neither the "how" or "why" of *Bruen*.

As to gun owners who do, in fact, pay the fee, the Superintendent offers a tax on open carry in Florida (A184), a tax on carry of pistols in North Carolina (235-236), and an ad valorem tax on "duelling or pocket pistol[s]" in Mississippi (A188).

These do not a historical tradition make, and in any event they would be unconstitutional today. Even setting *Bruen* aside, it is beyond the authority of government to precondition the exercise of an enumerated right on the payment of a special fee. For example, when Virginia imposed a $1.50 fee as a precondition to vote—a poll tax—it violated the right to vote and the Equal Protection Clause of the Fourteenth Amendment. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("the right to vote is too precious, too fundamental to be so burdened or conditioned."). Just the same, where Minnesota imposed a "use tax" on the cost of paper and ink products consumed in news periodicals, it violated the First Amendment. *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575 (1983). This is because government taxation schemes that impose differential treatment to those engaged in constitutionally protected liberties are presumptively unconstitutional. *Id*. at 585. New York's novel, redundant ammunition background checks fail under similar reasoning: they precondition Second Amendment rights on payment of a fee and the right of self-defense is simply "too precious, too fundamental to be so burdened or conditioned." *Harper*, 383 U.S. at 670.

If the Court finds ammunition background checks generally permissible, it should nevertheless enjoin the $2.50 fee.

### 6. The Second Amendment Prohibits Licensure of Every Sale of Ammunition Between Law-Abiding Citizens

The law requires any seller of ammunition to utilize the background check system. The Superintendent affirmed that "[a]ny individual engaged in the commercial sale of ammunition, whether sporadically or full-time, is required to register." A47 (Chiumento Decl. ¶14). Thus, for Mr. DiPietro to sell a box of .22 Long Rifle ammunition for $8.00 to Mr. Ortman, Mr. DiPietro must register as a seller of ammunition and conduct a background check of Mr. Ortman. *See* A17 (Compl. ¶26). Again, if this Court enjoins the enforcement of background checks, this problem is solved. But such a far-reaching licensure requirement, too, is unconstitutional in and of itself.

The court below again took prophylaxis to its extreme. "[S]ince it is undisputed that a license to obtain a firearm is constitutionally permissible, it stands to reason that requiring a license to sell those same arms is also constitutionally permissible[.]" SPA18. This again does not overcome, much less address, the "how" or "why" of *Bruen*. But the historic laws proffered by the Superintendent that are even remotely on point fail via their date of enactment. *See* A268-279, 283-305, 312-315. All of these statutes post-date the ratification of the Fourteenth Amendment by at least a decade. They are but "a handful of late-19th-century jurisdictions" that do not begin to suggest that the Second Amendment permits regulation of even the most minor sale of ammunition between law-abiding citizens. *Bruen*, 597 U.S. at 38.

The remaining regulations offered by the Superintendent are not analogous to anything in this case. New York enacted regulations to keep gunpowder dry in 1763. A316-321. In the year of the Revolution, New Jersey similarly sought to ensure "Quicknefs in Firing, Strength, Drynefs, and other Qualities" in "Gun-Powder." A322-325. Other statutes—again, a smattering far removed from the ratification of either the Second or Fourteenth Amendment, respectively—served similar purposes: that is, to keep a city from burning down due to improperly stored and maintained gunpowder. A326-340. These statutes were justified not on the basis of withholding gunpowder from certain individuals, but to ensure large stores of it did not explode. The inclusion of these laws here tips the hand of the government, revealing that their position is that a historic regulation justifies a modern regulation because it was a regulation.

The Second Amendment does not permit requiring a citizen to register with the government and conduct a background check to sell a box of .22 Long Rifle ammunition to a fellow law-abiding citizen. If ammunition background checks survive in any application, and they should not, this application of the laws at issue should be enjoined.

### 7. At a Minimum, New York's Ammunition Background Checks Are Unconstitutional As Applied

If the Court finds that ammunition background checks can be implemented on top of firearm background checks, firearm registration and firearm licensure

requirements, ammunition checks are at a minimum unconstitutional as applied following *Bruen*. Although ammunition background checks are not analogous to shall-issue licensing regimes for the carrying of firearms, the Plaintiffs have demonstrated that they impose "lengthy wait times in processing" and thereby "deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9. Ammunition background checks should be enjoined unless and until the Superintendent affirmatively proves that they are instant background checks and establishes that ammunition purchases are permitted when there is an outage.[4]

In a sworn statement, the Superintendent claimed that "[l]ike any system, the NYS NICS system may need to be down at times for scheduled maintenance or unexpected power outages, however, there has not been any significant downtime since the system went live, as demonstrated by the number of transactions processed." A52 (Chiumento Decl. ¶46). It amounts to an argument that, since the State Police processed 29,464 in a roughly one-month timeframe, with only 231 "remain[ing]" delayed on the date of the Superintendent's statement, there have been no lengthy wait times. A50 (¶¶33, 36). The Superintendent did not disclose what he considers "significant downtime," how much time can pass between submission of a background check and approval for him to still consider an approval "immediate[]"

---

[4] The latter is simply what the law requires in the first place. N.Y. Penal Law § 400.03(5).

(A50 (¶31)), how many of the 29,464 ammunition checks were "delayed" at all before approval (A49-50 (¶¶29, 33)) or the average or median length of a delay. The whole affidavit amounts to: 29,464 total approvals in a month means everything is fine.

Yet just a small sampling of the experiences of NYSFA members (in addition to Mr. Dorr, its executive director, on the day following the system's activation) shows what any normal person considers significant outages—ones that foreclosed purchases entirely—or lengthy wait times that delayed purchases for hours or days. A347-377. News coverage has only revealed more problems. *See* Derek Heid, *'75% of our customers have been delayed': Ammo background checks continue to bring stores and customers issues*, WKBW BUFFALO, Sept. 25, 2023, https://www.wkbw.com/news/local-news/75-of-our-customers-have-been-delayed-ammo-background-checks-continue-to-bring-stores-and-customers-issues [https://perma.cc/FGC3-Q2TS]; Eric Tichy, *Local sheriff stymied in ammo purchase after new law kicks in*, NIAGARA GAZETTE, Oct. 22, 2023, https://www.niagara-gazette.com/news/local_news/local-sheriff-stymied-in-ammo-purchase-after-new-law-kicks-in/article_29afc2de-70fc-11ee-89b5-a7c6da014582.html [https://perma.cc/V6FX-VDTV]; *Federal ruling upholds ammo checks amid ongoing lawsuit, frustrating gun shop owners*, YOUTUBE, May 5, 2024,

https://youtu.be/wjQYNXtAZ1A?si=rY0DwdLU93ntv766 (13WHAM ABC television news segment).

The court below took the Superintendent's affidavit beyond face value, ruling "the NYSP processed 29,464 *instantaneous* ammunition background checks." SPA17 (emphasis added). Even accepting that generous addition to the Superintendent's statement, it does not dispel the lengthy wait times evinced by the Plaintiffs and widely reported in the press. The court below ruled tersely that law-abiding gun owners may be substantially delayed or foreclosed from ammunition purchases so long as "the government says it has performed [others] without incident." SPA17. But individual rights are not subject to a good-enough-for-government-work standard. One must ask if any court would, for example, tolerate such a faulty system tasked with approving parade permits.

The amount of pretending required to ignore the real harms being inflicted by the license and record database is jarring. Even assuming the addition of ammunition background checks to New York's far-reaching regulatory regime is constitutional—and it is not—the operation of the system is unconstitutional as applied and should be enjoined pending a robust and clear demonstration from the Superintendent that the system actually works.

45

### B.  The Plaintiffs Have Demonstrated Irreparable Harm

The laws at issue have irreparably harmed the Plaintiffs and will continue to do so unless this Court restrains compulsory ammunition background checks and the associated fee. Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). The "denial of a constitutional right ordinarily warrants a finding of irreparable harm." *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021).

The background checks and associated fees wholly foreclose Messrs. Borrello, DiPietro, Ortman and myriad members of the NYSFA from exercising their Second Amendment right to purchase ammunition, and the Court cannot retroactively—only prospectively—remedy this denial, which is already approaching a year since the laws' effective date. The background check system harms other members of the NYSFA and Mr. Dorr because even if one is willing to undergo the background check and pay the fee, too often he cannot complete the purchase because the system is down or delayed. *See* A347-377; *see also* A52 (Chiumento Decl. ¶46). The laws at issue implement a wholesale denial of constitutional rights, facially and as applied, and thus inflict an irreparable harm.

### C.     The Balance of Equities and the Public Interest Weighs in Favor of an Injunction

The balance of equities and the public interest favors injunctive relief. "When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021), *opinion clarified,* 17 F.4th 368 (2d Cir. 2021) (citing *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020)). The Plaintiffs seek to preserve "the last actual, peaceable uncontested status which preceded the pending controversy", when they and other law-abiding citizens could purchase ammunition free from repetitive, redundant background checks and fees. *North American Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (internal quotations and citations omitted). The public has a significant interest in the "strong sense of the safety that [ammunition] regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves[.]" *Antonyuk v. Bruen*, 624 F. Supp. 3d 210, 260 (N.D.N.Y. 2022). This interest is not outweighed by—and should not even be subject to—a database that has frequently failed and delayed lawful ammunition purchases. *See* A347-377; *see also* A51 (Chiumento Decl. ¶37).

The government may claim an interest in public safety, but that is unsupported in the record. Here, taking the Superintendent's claims at face value, he claimed that in the month following the activation of the database that "only 161 ammunition

transactions were denied (0.55% of all checks)" and 251 were "delayed[.]" A50 (Chiumento Decl. ¶¶35-36). Yet among 32 appeals arising from purchase denials in the first few weeks of state background checks, more than half were overturned. A51 (¶37). Of the upheld appeals, "eight (8) were mental health related, two (2) were NY state prohibitors . . . and one (1) was a felony conviction." A51 (¶39).[5] Again, accepting this evidence as-is—with no idea, for example, as to what the Superintendent considers a "delay" of approval in the first place—these numbers are paltry. And even if the Court accepts a theoretical "instant" background check for ammunition purchases, the system at issue plainly does not provide that. A347-377. The equities and public interest tip in favor of enjoining ammunition background checks.

## CONCLUSION

New York's ammunition background checks "prevent law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms", including Messrs. Borrello, DiPietro, Ortman, Dorr and myriad members of the NYSFA. *Bruen*, 142 S. Ct. at 2156. For the foregoing reasons, this Court should reverse the ruling of the court below and enter an order reversing the dismissal of

---

[5] The Superintendent did not differentiate between appeals for denials of firearm or ammunition purchases—it appears to be some mixture of both. A51 (¶¶37-39). Firearm background checks, it bears repeating, are not challenged in this case.

NYSFA from this case and enjoining the Superintendent from enforcing New York's ammunition background checks.

Respectfully submitted on the 23rd day of July, 2024.

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

/s/ Benjamin Barr
Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue
Chicago, IL 60611
(202) 595-4671 Telephone
ben@barrklein.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,578 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

/s/ Stephen Klein

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Decision and Order of the Honorable Frank P.
Geraci, Jr., dated May 2, 2024, Appealed From ....    SPA-1

SPA-1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NEW YORK STATE FIREARMS ASSOCIATION, et al.

                              Plaintiffs,

                                          Case # 23-CV-6524-FPG

v.

                                          DECISION AND ORDER

STEVEN G. JAMES,[1] in his capacity as
Superintendent of the New York State Police,

                              Defendant.

### INTRODUCTION

Plaintiffs have filed this action pursuant to 42 U.S.C. § 1983, seeking a declaration from the Court that Sections 400.02 and 400.03 of the New York Penal Law and Section 228 of the New York Executive Law are unconstitutional to the extent those statutes require the performance of a background check, and the payment of a fee for a background check, in connection with the purchase of ammunition. ECF No. 4 at 10 ¶¶ 1-2. Plaintiffs are also seeking an order restraining Defendant, Steven G. James, in his official capacity as acting superintendent of the New York State Police ("Superintendent"), from enforcing those same provisions. ECF No. 4 at 10 ¶ 3.

In connection with Plaintiffs' initial filing, Plaintiffs also filed a motion for a temporary restraining order ("TRO"), which the Court denied on September 21, 2023. ECF Nos. 5, 9. Presently before the Court is Plaintiff's motion for a preliminary injunction. ECF No. 5. For the following reasons, Plaintiffs' motion is DENIED.

### BACKGROUND

---

[1] Steven A. Nigrelli, formerly Superintendent of the New York State Police, was sued in his official capacity. By operation of Federal Rule of Civil Procedure 25(d), Steven G. James was automatically substituted upon assuming the office of Superintendent of the New York State Police on April 4, 2024, following his confirmation by the New York State Senate. The Clerk of Court is hereby directed to update in the case caption to reflect the name of the substituted party.

The following facts are taken from Plaintiffs' amended complaint and declarations submitted in opposition to the motion for a preliminary injunction by the Superintendent.

## I.   The CCIA

The laws that Plaintiffs seek to have invalidated—Sections 400.02 and 400.03 of the New York Penal Law and Section 228 of the New York Executive Law—are a part of the "Concealed Carry Improvement Act" ("CCIA"), which was passed by the New York State Legislature on July 1, 2022.  Under the CCIA, the Division of State Police ("NYSP") must establish "a statewide license and record database specific for ammunition sales," containing transaction information generated by licensed sellers. *See* N.Y. Penal Law § 400.02(2); N.Y. Exec. Law § 228. Information that must be kept includes the time of the transaction, the date, name, age, occupation, and residence of the purchaser, and the amount, caliber, manufacturer's name, and serial number on such ammunition. N.Y. Penal Law § 400.02(2)(a).

As of September 13, 2023, a background check is required with every ammunition purchase, with the check conducted by the NYSP. N.Y. Exec. Law § 228. The background check system is supported by a $2.50 fee paid by dealers. *See* N.Y. Exec. Law § 228(5)(a); ECF No. 19-1 ¶¶ 8, 16.

When an ammunition sale is made, a dealer contacts NYSP directly. ECF No. 19-1 ¶ 26. NYSP then performs searches against New York State data sources to determine if the purchase would violate 18 U.S.C. § 922(g) or equivalent state law. *Id.* ¶ 29. If no potentially disqualifying New York State records are identified, the transaction is approved and a "proceed" response is transmitted to the dealer or seller. *Id.* If any potentially disqualifying records are identified, the transaction is "delayed," and an examiner employed by the State Police reviews the application by hand. *Id.* The examiner will review the response, conduct any additional research required to

2

determine whether the purchaser can lawfully possess ammunition, and ultimately adjudicate the transaction as either a "proceed" or "deny." *Id.*

As of October 9, 2023, the NYSP processed 29,464 ammunition transactions, of which 29,037 (or 98.6%) were approved and 161 were denied (0.55%). *Id.* ¶ 33-35. The remaining 231 ammunition transactions were "delayed," or 0.78% of the total, while further human review was performed to determine whether the prospective purchaser may legally take possession of ammunition. *Id.* ¶ 36. Only 32 people appealed the denial of their background check, with 19 of those appeals ultimately being overturned. *Id.* ¶ 37. Of the eleven appeals upheld, eight were for mental health-related issues, two were based on state statutory disqualifiers (either a conviction for a "serious offense" under N.Y. Penal Law § 265.00(17) or an active Extreme Risk Protection Order under CPLR Article 63-A), and one was for a prior felony conviction. *Id.* ¶¶ 37-39.

As of October 13, 2023, the NYSP hired 29 full-time examiners for the ammunition background check process and reassigned seven sworn members to the point of contact unit. *Id.* ¶ 27. NYSP also procured space and equipment for the system. *Id.*

The money collected from background check fees goes to support the background check system, and only the background check system. N.Y. Exec. Law §228(5)(a). Section 99-pp of the New York State Finance Law requires that "all revenues" in connection with background checks are placed in a "background check fund," which may be used only "for the direct costs associated with background checks." N.Y. State Fin. Law § 99-pp(3).  If the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee." *Id.* § 99-pp(5).

## II.    FACTS

SPA-4

Plaintiff William Ortman is a resident of New York. ECF No. 4 ¶ 7. On September 13, 2023, Ortman went to M&M Sports Den in Jamestown, New York to purchase ammunition. ECF No. 4 ¶ 24. However, when told that he would need to submit to a background check and pay a fee therefor, he declined to proceed with the purchase. *Id.*

Plaintiffs George Borrello and David DiPietro are both elected members of the New York State Legislature who voted against the CCIA, ECF No. 4 ¶ 5-6, and claim that "but for the background check and associated fee, [they] would purchase ammunition from licensed firearms dealers." ECF No. 4 ¶¶ 22-23.

The New York State Firearms Association ("NYSFA"), is a nonprofit membership organization with almost 10,000 members who live in New York state and own and possess firearms. ECF No. 4 ¶ 8. Plaintiff Aaron Dorr is the executive director of NYSFA and he also owns and possesses firearms. ECF No. 4 ¶ 9. On September 14, 2023, Dorr attempted to purchase ammunition from the WalMart in Canandaigua but alleges that the statewide license and record database was not operational, preventing him from completing the purchase. *Id.* ¶ 25. He alleges that he attempted to purchase ammunition from Runnings in Canandaigua but with the same result. *Id.* Dorr alleges that he would have otherwise completed the purchase despite the background check requirement. *Id.*

Plaintiffs DiPietro and Ortman further allege that DiPietro would like to sell ammunition to Ortman, but that they cannot engage in this transaction without incurring a $1,000 fine unless they "involv[e] a licensed dealer in firearms or registered seller of ammunition" or unless "Mr. DiPietro register[s] as a seller of ammunition." ECF No. 4 ¶ 26.

**DISCUSSION**

SPA-5

Plaintiffs argue that the ammunition background check and associated fees imposed under the CCIA infringe upon their right to bear arms under the Second Amendment of the United States Constitution. "Disgusted" by this infringement, they seek to enjoin the Superintendent from enforcing this law and to have this law declared unconstitutional to the extent it requires a background check for purchasing ammunition. ECF No. 5-1 at 5. The Superintendent responds to Plaintiff's motion, first, by arguing that none of the Plaintiffs have standing to bring suit. ECF No. 19 at 15-20. The Superintendent also opposes the motion on the merits.  He argues that Plaintiffs have not properly shown that they are entitled to a preliminary injunction because they have not shown that there is a clear likelihood of success, nor have they shown irreparable harm or that the balance of equities and the public interest tilts in their favor. ECF No. 20-43.

> I.      **Standing**

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir.2006). To establish Article III standing, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

> **A.  Associational Standing**

"It is the law of the Second Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). This case is brought entirely under section 1983 and NYSFA, the organizational plaintiff, makes clear that it is asserting "the rights of its members" as a basis for standing with no attempt to establish standing on its own behalf. ECF No. 24 at 8. Accordingly,

SPA-6

NYSFA does not have standing to bring this suit. The analysis should stop there, but NYSFA insists that it should enjoy standing to assert alleged injury to its members based on *Warth v. Seldin*, 422 U.S. 490 (1975) and its progeny, implying a mistaken belief that *Warth* creates tension with the law of the Second Circuit regarding organizational standing in Section 1983 cases such that the latter should be disregarded.

In *Warth*, the Supreme Court held that "in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth*, 422 U.S. at 511. While this is a true statement of the law, this associational standing is conditioned on the "nature of the claim" and the "relief sought," such that "the individual participation of each injured party [is not] indispensable to proper resolution of the cause." *Id.* These nature-of-claim and relief-sought conditions continue to form the basis of the Supreme Court's organizational standing jurisprudence. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("An association has standing to bring suit on behalf of its members" so long as "*neither the claim asserted nor the relief requested* requires the participation of individual members in the lawsuit.") (emphasis added). Therefore, in order to establish standing under *Warth*, NYSFA must still show that the nature of the claim it brings does not require the individual participation of its members.

The rule in *Nbebe* fits neatly within *Warth*'s nature-of-claim condition because it is based on the Second Circuit's interpretation of Section 1983 claims as those that are "personal to those who are purportedly injured." *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984). Because these claims are personal to those that are injured, it necessarily follows that cases that bring these claims "require[] the participation of individual members." *Friends of the Earth, Inc.*, 528 U.S. at 181.

SPA-7

This understanding of Section 1983 claims continues to prevail in the Second Circuit and was recently the basis for dismissing an organizational plaintiff in Connecticut for lack of standing to the extent it asserted a violation of constitutional rights by way of Section 1983 on behalf of its members. *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) ("Because [organizational plaintiff] brought this case under 42 U.S.C. § 1983, it lacked standing to assert the rights of its members." (international quotations omitted)).

Although an organization may nevertheless bring a Section 1983 suit on its own behalf, so long as it independently satisfies the requirements of Article III standing, NYSFA makes no attempt to do so. *Nnebe*, 644 F.3d at 156. Rather, NYSFA insists that it "is not asserting its rights, but rather alleges that the rights of its members are in controversy." ECF No. 24 at 8.

The law is clear—organizations do not have standing to bring suits on behalf of its members under Section 1983. NYSFA is clear—it brings this case under section 1983 on behalf of its members. Accordingly, NYSFA has no standing.  As a result, all claims asserted by NYSFA must be dismissed without prejudice.  *See Green Haven*, 16 F.4th 67 ("Because the question of standing goes to the constitutional limitations on the "judicial Power of the United States," which is limited to resolving "Cases" or "Controversies," U.S. Const. art. III, we "are entitled at any time sua sponte to delve into the issue" of standing even if defendants do not raise the issue.").

### B.  Individual Standing to Challenge Background Checks and Fees

The Superintendent challenges the standing of the individual Plaintiffs because they have not submitted themselves to the background check that they seek to have declared unconstitutional. ECF No. 19 at 10. Relying on the rule announced in *United States v. Decastro*, the Superintendent argues that in order "to establish standing to challenge an allegedly unconstitutional policy, a

plaintiff must submit to the challenged policy." 682 F.3d 160, 164 (2d Cir. 2012) (quoting *Jackson–Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir.1997)). The Court disagrees.

Recently in *Antonyuk*, the Second Circuit clarified that the rule in *Decastro* applies only in circumstances where a plaintiff challenges the eligibility criteria for obtaining ammunition rather than the application process for obtaining ammunition. See *Antonyuk v. Chiumento*, 89 F.4th 271, 309 (2d Cir. 2023). In cases where a plaintiff challenges "a component of the application process itself," the injury flows from that application process, and the law does not require a plaintiff to go through the process. *Id.*

Here, one of the criteria for obtaining ammunition is that a prospective purchaser's purchase does not violate 18 U.S.C. § 922(g) or equivalent state law. The background check is simply the process for determining whether or not the criteria is met. Plaintiffs are not challenging the criteria for obtaining ammunition rather Plaintiffs are challenging the process for determining whether the criteria is met.

Under these circumstances, the Second Circuit held that plaintiffs are not required to seek and be refused ammunition before challenging the constitutionality of the background check process. *Id.* at 311 ("when the plaintiff challenges the application process itself . . . he is *not* required to first apply for and be refused a license." (italics in original)). Accordingly, the Court finds that Plaintiffs have standing to challenge the background check process.

Because the fees that Plaintiffs challenge are incidental to the background check process that they challenge, the Court finds that the individual Plaintiffs have standing to challenge the fees as well.

### C.  Individual Standing to Challenge the Licensing Requirement

Finally, the Superintendent challenges DiPietro and Ortman's standing to challenge the portion of the CCIA requiring that they involve a licensed dealer in their proposed ammunition transaction between them because they have not shown that "there exists a credible threat of prosecution" under the challenged law. *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023). In the Amended Complaint, Plaintiffs allege that DiPietro would like to sell 100 rounds of ammunition to Ortman for $8.00 but fears that he will be subjected to a fine of $1,000 if they do not involve a licensed dealer or registered seller of ammunition to act as an intermediary. ECF No. 4 ¶ 26; N.Y. Penal Law § 400.03(7)-(8). Section 4003.03(7) reads: "No commercial transfer of ammunition shall take place unless a licensed dealer in firearms or registered seller of ammunition acts as an intermediary between the transferor and the ultimate transferee of the ammunition for the purposes of contacting the statewide license and record database pursuant to this section." The Superintendent argues that there is no credible threat of prosecution because the prohibition only applies to "sellers of ammunition," which is defined as someone "who engages in the business of purchasing, selling or keeping ammunition." N.Y. Penal Law § 265.00(24). In the Superintendent's view, DiPietro is not a "seller of ammunition" and therefore any transfers he undertakes are not subject to Section 400.03(7). The Court disagrees.

First, the Court disagrees with the Superintendent's interpretation of section 400.03. If, as the Superintendent argues, that provision only applies to "sellers of ammunition," then it would be redundant to require a licensed dealer or seller of ammunition to be involved in the transaction because a seller of ammunition would necessarily be involved in every situation where paragraph seven would apply as a function of the provision only applying in circumstances with sellers of ammunition.

Second, for the purposes of standing, the Court "do[es] not defer to the government's interpretation of the statute," nor does it need to "to offer a definitive or comprehensive interpretation of the CCIA." *Antonyuk*, 89 F.4th at 336-37. Rather, the Court need only "consider whether the plaintiff's intended conduct is '*arguably* proscribed' by the challenged statute, not whether the intended conduct is *in fact* proscribed." *Id*. 336-37 (italics in original). Plaintiffs have stated that they intend to transfer ammunition between themselves and that neither is a licensed dealer or a registered seller of ammunition. Since the law requires a registered seller of ammunition or licensed dealer to act as an intermediary, Plaintiffs have described a desire to engage in a course of conduct that is arguably proscribed by the statute. Accordingly, the Court finds that they have demonstrated a credible threat of prosecution sufficient to establish standing to challenge this portion of the law.

## II.    Preliminary Injunction

### A.  Legal Standard

Generally, a party seeking a preliminary injunction must ordinarily establish (1) "irreparable harm"; (2) "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party"; and (3) "that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

To succeed on the merits of their complaint, Plaintiffs must show that the challenged law is unconstitutional under the standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). There, the Supreme Court set out a new framework for analyzing constitutional challenges to laws under the Second Amendment. First, a court must consider

whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If yes, then "the Constitution presumptively protects that conduct." *Id.* To overcome the presumption, "the government must demonstrate that the regulation is consistent with [the] Nation's historical tradition of firearm regulation." *Id.*

### 1. Ammunition is Covered by the Second Amendment

The relevant conduct at issue in this dispute is the purchase of ammunition. However, "the Second Amendment [only] protects 'arms,' 'weapons,' and 'firearms'; it does not explicitly protect ammunition." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Curiously, Plaintiffs cite the Merriam Webster dictionary to argue that "ammunition is not 'arms,' and arms are not 'ammunition.'" ECF No. 24 at 20; *see also Arms*, MERRIAM WEBSTER ("a means (such as a weapon) of offense or defense"); and *Ammunition*, MERRIAM WEBSTER ("the projectiles with their fuses, propelling charges, or primers fired from guns"). It is unclear how in arguing this distinction, Plaintiffs expect to obtain the relief they seek when such distinction would clearly put ammunition beyond the protection of the Second Amendment. Nevertheless, the distinction that Plaintiffs seek to advance is unavailing because, although the Second Amendment does not protect ammunition directly, arms lose their deadly force without ammunition, which is why courts have consistently held that ammunition is protected by the Second Amendment. *See United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition."); s*ee also Jackson*, 746 F.3d at 967 ("Without bullets, the right to bear arms would be meaningless."); *Nat'l Ass'n for Gun Rts. v. Lamont*, No. CV 3:22-1118, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023) ("Components of firearms that are necessary to their operation, such as ammunition, are covered by the Second Amendment."). Therefore, the purchase

of ammunition enjoys derivative protection under the Second Amendment's operative clause that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

Defendant argues that background checks to purchase ammunition is not covered by the Second Amendment because the background checks and nominal fees do not constitute infringements. ECF No. 14-17. Citing a collection of historical definitions, Defendants make a compelling argument that the historical understanding of the word "infringe" refers only to significant or complete violations of the right. *Id.* at 15. This argument, however, is also unavailing, because the proper inquiry at this stage of the analysis is not whether a right under the Second Amendment is infringed, it is whether the "the Second Amendment's plain text covers an individual's conduct" at all. *Bruen*, 597 U.S. at 17. As discussed above, this Court concludes that the Second Amendment does cover Plaintiffs' conduct—the purchase of ammunition. Such conduct is therefore presumptively protected by the Second Amendment.

### 2.  History and Tradition Analysis

Having determined that Plaintiffs' conduct falls under the protection of the Second Amendment, the burden now shifts to the government to "demonstrate that the regulation is consistent with [the] Nation's historical tradition of firearm regulation." *Id.* Specifically, the Court will consider whether there exists a history and tradition of background checks for ammunition, fees incident to background checks, and the requirement to involve a licensed dealer in a commercial exchange of ammunition.

### a.  Background Checks

The Court concludes that the ammunition background check requirement is consistent with "the well-recognized historical tradition of preventing dangerous individuals from possessing weapons." *Antonyuk v. Chiumento*, 89 F.4th 271, 307 (2d Cir. 2023).

There is no disagreement that dangerous individuals may be restricted from owning or possessing a firearm without violating the Constitution. *See United States v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023) (finding that the historical record "suggest[ed] a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed.").

The government offers several historical examples of laws that were enacted to disarm dangerous individuals, but the Court will discuss only one of the many analogues offered. In colonial Virginia, the legislature dictated that no Catholics "shall, or may have, or keep in his house or elsewhere, or in the possession of any other person to his use, or at his disposition, any arms, weapons, gunpowder or ammunition" because it was determined that "it is dangerous at this time to permit [Catholics] to be armed." VII William Waller Hennig, *A Collection of all the Laws of Virginia* 35 (1820), ECF No 19-17 at 4.

Although Plaintiffs argue that this law is "problematic" because it targets a group of people because of their religion in clear violation of religious liberties guaranteed by the Constitution, ECF No. 24 at 17, it does not undermine the basic principle animating the law which is the determination of dangerousness. ECF No. 24 at 17. The problematic aspect of this law is that religion is the basis upon which the legislature determined that a particular group was deemed dangerous. However, ignoring the invidious discrimination informing the determination of what constitutes dangerousness, the legislature's decision to restrict gun (or ammunition) ownership because of the prospective owner's dangerousness is perfectly permissible under the Second Amendment and well-established in the historical tradition of gun regulation in America. *See United States v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023) ("Even if the disarming of . . . Catholics

was limited to exigent historical contexts, no party identifies disputes regarding the lawfulness of such prohibitions at the time.") (internal quotations omitted).

It is also undisputed that states are permitted to employ mechanisms to "ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n. 9. Again, the historical record reflects this well-established tradition of the state assuring itself that a gun owner will behave responsibly after the purchase of a firearm. For example, where states disarmed Catholics, some Catholics were able to overcome disarmament by taking an oath of loyalty.  Although an oath and a background check are distinct in their mechanisms, they are analogous in their objective as well as in how they are situated in the process of purchasing a firearm. Their objectives are the same in that they both serve to assure the state that the purchaser would be a law-abiding, responsible gun owner. Their mechanisms are distinct in that a background check investigates the purchaser's past to determine future behavior, whereas the oath relies on a present-day promise of the purchaser's future behavior. In both cases, the state is looking to assure itself of safe future behavior. They are also both equally situated in the process of purchasing a firearm in that they are both pre-purchase burdens employed to confirm the objective. Even absent the foregoing analysis of an analogous historical law, the case law also firmly establishes this understanding of history—that background checks are permissible to determine future safe behavior with arms. *See Antonyuk v. Chiumento*, 89 F.4th 271, 330 (2d Cir. 2023) (describing backgrounds checks as having long been permissible); *Allen v. D.C.*, No. 20-CV-02453, 2024 WL 379811, at *3 (D.D.C. Feb. 1, 2024) ("Bruen suggests that [] objective standards could be deployed as part of a background check system.")

Because the historical tradition for background checks prior to purchasing a firearm or ammunition is clearly established, Plaintiffs' facial objection to the background checks must fail.

14

That said, "because any permitting scheme can be put toward abusive ends," the *Bruen* Court maintained that plaintiffs may challenge the Constitutionality of a background check system "where, for example, lengthy wait times in processing . . . or exorbitant fees deny ordinary citizens their right[s]." *Bruen*, 597 U.S. at 38 n. 9. Recognizing this alternative avenue to challenge the law, Plaintiffs have attempted to frame their challenge in such terms by arguing that ammunition background checks involve "*per se* lengthy wait times, whether they take minutes, hours, or days" because they create a "never-ending" burden for which "there is no historical analogue." ECF No. 24 at 7, 10.

First, Plaintiffs offer no support for their assertion that the ammunition background checks are "per se" lengthy other than by framing the requirement as "never-ending." *Id.* Moreover, this framing is fundamentally misleading insofar as it implies that background checks for firearms would or should end after the first instance. Plaintiffs are incorrect. Under federal law, when individuals seek to purchase a firearm, they must submit to a background check at each instance that they purchase a firearm. 18 U.S.C. § 922 (t)(1)(A). The CCIA merely imposes the same requirement for ammunition—a background check at each instance of a purchase. If, according to Plaintiffs, the ammunition background checks are "never-ending," then background checks for firearms are also "never-ending" because a background check for one firearm does not transfer over to the purchase of a second, third or fourth firearm. Therefore, the purported "never-ending" component to ammunition background checks is simply another way to say that background checks are required prior to each purchase of ammunition in the same way they are required prior to each purchase of a gun. However, as previously noted, nothing in the history of firearm regulation in the United States contradicts the widespread agreement that "restrictions which

15

prevent dangerous individuals from wielding lethal weapons are part of the nation's tradition of firearm regulation." *Antonyuk*, 89 F.4th at 312.

Second, Plaintiffs have also stated that "the average, gun-owning American purchases just over 100 rounds [of ammunition] per year," and "[a]mmunition boxes generally hold twenty to fifty rounds." ECF No. 24 at 21. Therefore, according to Plaintiffs' own statistics, a purchaser of ammunition would only need to submit to an instantaneous ammunition background check about two to five times per year. This alone does not rise to the level of a lengthy wait time that effects the denial of Second Amendment rights.

Plaintiffs also attempt to argue that the background check system causes unconstitutional delays in practice because of system malfunctions. However, the record before this Court and the allegations in Plaintiffs' complaint do not support a finding that Plaintiffs are likely to succeed in showing that the ammunition background checks are so lengthy in practice, that citizens are being denied their rights to bear arms. On the one hand, Plaintiffs offer declarations from ten other members of NYSFA who have encountered some kind of delay due to an alleged malfunction of the background check system. ECF Nos. 24-2-10.[2] Together, these declarations allege that the background check system was unavailable at certain periods of time at specific locations on September 19, September 28, October 10, October 14, October 20, October 24, and October 25. Because of the system's unavailability, these declarants allege that they were not able to complete

---

[2] Because these declarations offer additional evidence submitted for the first time in reply, the Superintendent has moved to strike these additional declarations. ECF No. 25. Indeed, Plaintiffs should have been more diligent in filing their complaint by including these declarations in their initial filing. However, because the Court finds that the Superintendent would not be prejudiced by the consideration of these additional declarations, the Court exercises its discretion to consider these additional declarations for the purpose of the present motion. *See Kingstown Cap. Mgmt., L.P. v. Vitek*, No. 20-3406, 2022 WL 3970920, at *1 (2d Cir. Sept. 1, 2022) (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)) ("The district court has discretion to consider arguments made and evidence submitted for the first time in a reply brief."). Accordingly, the Superintendent's motion to strike is denied.

their purchases. *Id.* On the other hand, the government has proffered a declaration which affirms that as of October 9, 2023, the NYSP processed 29,464 instantaneous ammunition background checks. *See* ECF No. 19-1 ¶ 33-35; *See also* ECF No. 19-1 ¶ 31 ("For transactions where no potentially disqualifying record is identified, the system returns a "proceed" response *immediately*.") (emphasis added). Even if those ten members of NYSFA experienced a lengthy wait time at the time of their individual purchases, those ten experiences are simply not enough to outweigh the tens of thousands of other background checks that the government says it has performed without incident. Accordingly, the Court finds that Plaintiffs are not likely to succeed on the merits of an as-applied challenge of the background check system either.

### b. Licensing

Plaintiffs also challenge the requirement that a seller of ammunition be licensed or that commercial ammunition transfers involve a licensed dealer. The historical tradition of requiring a seller of ammunition or firearms to be licensed is also well-established. As a Florida law from 1838 demonstrates, it has long been understood that the Second Amendment permits a state to impose a license requirement on those selling guns and ammunition. *See* 1838 Fla. Laws 36, ECF No. 19-23 (prohibiting anyone from selling certain weapons "until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars" in exchange for "a written certificate, stating that they have complied with the provisions of this act.").

Although this is only one law, it is "not dispositive whether comparable historical regulations exist in significant numbers." *Antonyuk*, 89 F.4th at 303. "[T]he absence in other jurisdictions of positive legislation distinctly similar to a proffered historical analogue does not command the inference that legislators there deemed such a regulation inconsistent with the right

to bear arms." *Id.* Moreover, since it is undisputed that a license to obtain a firearm is constitutionally permissible, it stands to reason that requiring a license to sell those same arms is also constitutionally permissible since the dealer would have to lawfully obtain the arms in order to sell them in the first place.

### c.  Fees

Plaintiffs also complain of the background-check fee, arguing that "it is beyond the authority of government to precondition the exercise of an enumerated right on the payment of a special fee." ECF No. 5-1 at 8. Plaintiffs are incorrect for several reasons. First, the fee provision under CCIA is payable by the dealer, not the purchaser. Plaintiffs argue, however, that "licensed dealers are passing this fee onto purchasers." ECF No. 5-3 ¶ 21. Even assuming Plaintiffs are correct in their assertion, in the context of the Second Amendment, "imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013). That is exactly how the background check fee under the CCIA is designed.

Under the CCIA, the money collected from background check fees goes to support the background check system, and only the background check system. N.Y. Exec. Law §228(5)(a). Section 99-pp of the New York State Finance Law requires that "all revenues" in connection with background checks are placed in a "background check fund," which may be used only "for the direct costs associated with background checks." N.Y. State Fin. Law § 99-pp(3). If the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee." *Id.* § 99-pp(5).

*Bruen* did not alter this settled principle, only cautioning that "exorbitant fees [that] deny ordinary citizens their right to public carry" may be constitutionally challenged on a case-by-case basis. *Bruen*, 142 S. Ct. at 2138 n.9. Plaintiffs have not made a specific challenge that the $2.50 fee is so exorbitant that their rights are being denied, but only make an argument that any fee whatsoever is unconstitutional. Even if Plaintiffs were to bring an as-applied challenge to argue that the CCIA background check fee was so exorbitant that their rights are being denied, it is unlikely that Plaintiffs' challenge would succeed because the $2.50 fee falls well below amounts previously approved as constitutional.

For example, in *Kwong*, the Second Circuit upheld a gun license renewal fee in the amount of $340. In the context of the CCIA, a gunowner would need to purchase ammunition on a weekly basis for more than two and a half years to reach the same fee amount. However, by Plaintiff's own estimation "the average, gun-owning American purchases just over 100 rounds [of ammunition] per year," and "[a]mmunition boxes generally hold twenty to fifty rounds." ECF No. 24 at 21. Therefore, assuming gun owners purchase ammunition only one box at a time, a purchaser of ammunition would only need to pay this minimal fee about two to five times per year, which amounts to only $5-$12.50 per year. That is far below the $340 deemed constitutional in *Kwong*.

Plaintiffs have not shown a likelihood that the challenged law is unsupported by a well-established historical tradition of firearms regulation which is a requirement for success on the merits of their constitutional challenge. Accordingly, Plaintiffs have not met their burden of showing they are likely to succeed on the merits of their Constitutional challenge. Absent a showing of a likelihood to succeed on the merits, the Court need not consider irreparable harm or the balance of interests, and Plaintiffs' motion must be denied. *See Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) ("Plaintiffs must establish a likelihood of success on the

SPA-20

merits. Because we conclude that Plaintiffs have failed to satisfy this burden, there is no need to address the other prongs of the analysis.").

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction, ECF No. 5, is DENIED.  The Superintendent's motion to Strike, ECF No. 25, is DENIED. All claims asserted by NYSFA are DISMISSED WITHOUT PREJUDICE.


IT IS SO ORDERED.

Dated:  May 2, 2024
          Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

20