# 24-1290

## United States Court of Appeals
## for the Second Circuit

NEW YORK STATE FIREARMS ASSOCIATION, GEORGE BORRELLO, DAVID DIPIETRO, WILLIAM ORTMAN, AARON DORR,

*Plaintiffs-Appellants,*

v.

DOMINICK L. CHIUMENTO, in his official capacity as Acting Superintendent of the New York State Police,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of New York

**BRIEF FOR DEFENDANT-APPELLEE**

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Defendant-Appellee
The Capitol
Albany, New York 12224
(518) 776-2023

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
BEEZLY J. KIERNAN
  *Assistant Solicitor General*
    *of Counsel*

Dated: October 22, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT ..................................................... 1

ISSUES PRESENTED ................................................................... 1

STATEMENT OF THE CASE ....................................................... 4

    A.   Statutory Background ..................................................... 4

        1.   Firearm background checks ................................... 4

        2.   Ammunition background checks ........................... 6

    B.   Procedural History ......................................................... 8

STANDARD OF REVIEW ........................................................... 14

SUMMARY OF ARGUMENT .................................................... 15

ARGUMENT ................................................................................ 16

POINT I

    PLAINTIFFS LACK STANDING TO CHALLENGE THE AMMUNITION
    BACKGROUND CHECK, FEE, AND REGISTRATION REQUIREMENTS .......... 16

    A.   The Individual Plaintiffs Lack Any Concrete Injury
        Traceable to the Challenged Laws. ........................................ 17

    B.   NYSFA Lacks Standing to Assert Claims on Behalf of
        Its Members. ........................................................................ 22

**Page**

POINT II

    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION AGAINST THE AMMUNITION BACKGROUND CHECK, FEE, AND REGISTRATION REQUIREMENTS ............................................. 23

    A.   Modest Conditions and Qualifications on the Commercial Sale of Ammunition Do Not Implicate the Text of the Second Amendment. ............................................ 24

    B.   Background Checks, Fees, and Registration Requirements Are Consistent with the Nation's History and Tradition of Firearm Regulation..................................... 29

        1.   Background checks ......................................... 30

        2.   Fee ................................................................. 37

        3.   Registration requirement................................. 39

POINT III

    PLAINTIFFS FAILED TO DEMONSTRATE IRREPARABLE HARM ABSENT AN INJUNCTION OR THAT AN INJUNCTION IS IN THE PUBLIC INTEREST ....................................................................... 41

CONCLUSION ...................................................................... 44

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Antonyuk v. Chiumento,*
   89 F.4th 271 (2d Cir. 2023) .................................................................. 20

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................... 18, 21

*Connecticut Citizens Def. League, Inc. v. Lamont,*
   6 F.4th 439 (2d Cir. 2021) ..................................................................... 22

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...................................................................... 1, 24

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
   559 F.3d 110 (2d Cir. 2009) .................................................................. 41

*Food & Drug Admin. v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ............................................................................. 18

*Gazzola v. Hochul,*
   88 F.4th 186 (2d Cir. 2023) .......................................................... 24, 26

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
   481 F.3d 60 (2d Cir. 2007) .................................................................... 41

*Green Haven Prison Preparative Meeting of Religious Soc'y of
   Friends v. New York State Dep't of Corr. & Cmty.
   Supervision,*
   16 F.4th 67 (2d Cir. 2021) ..................................................................... 14

*Knife Rts., Inc. v. Vance,*
   802 F.3d 377 (2d Cir. 2015) .................................................................. 22

*Kwong v. Bloomberg,*
   723 F.3d 160 (2d Cir. 2013) ........................................................ 14, 37-38

*Lee v. U.S. Dep't of Just.,*
   554 F. Supp. 3d 1228 (N.D. Ala. 2021)................................................. 19

**Cases**                                                      **Page(s)**

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ................................................................ 17

*Maryland Shall Issue, Inc. v. Moore,*
   116 F.4th 211 (4th Cir. Aug. 23, 2024) ................................... 27, 29, 32

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ................................................................ 24

*McRorey v. Garland,*
   99 F.4th 831 (5th Cir. 2024) ................................................... 26, 29

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   597 U.S. 1 (2022) .................................................... 1, 24-25, 30, 34, 38

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................ 42

*Nnebe v. Daus,*
   644 F.3d 147 (2d Cir. 2011) ................................................... 22

*Robinson v. Sessions,*
   721 F. App'x 20 (2d Cir. 2018) ............................................... 19-20

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ................................................................ 16

*United States v. Decastro,*
   682 F.3d 160 (2d Cir. 2012) ................................................... 19

*United States v. Diaz,*
   116 F.4th 458 (5th Cir. 2024) ................................................. 33

*United States v. Manney,*
   114 F.4th 1048 (9th Cir. 2024) ............................................... 26-29

*United States v. Rahimi,*
   144 S. Ct. 1889 (2024) ............................................. 23, 30-33, 35

| Cases | Page(s) |
|---|---|

*United States v. Scheidt,*
   103 F.4th 1281 (7th Cir. 2024) ......................................27-29

**Constitutions**

U.S. Const. amend. II ........................................................24

**Federal Statutes**

18 U.S.C.
   § 922(a)(6)..............................................................27
   § 922(d)...................................................................4
   § 922(g)...................................................................4
   § 922(g)(8).............................................................32
   § 922(t)....................................................................5

42 U.S.C.
   § 1983................................................................2, 22

**New York State Statutes**

Ch. 1, 2013 N.Y. Laws ......................................................6

Ch. 371, 2022 N.Y. Laws ...................................................6

C.P.L.R.
   article 63-A............................................................4
   article 78................................................................6

Executive Law
   § 228.................................................................5, 10
   § 228(1)(b).............................................................5
   § 228(5)(a)....................................................8, 10, 37
   § 228(8)..................................................................6

General Business Law
   § 898.....................................................................5

## New York State Statutes                                          **Page(s)**

Penal Law

§ 265.00(24) ................................................................ 7, 21

§ 400.02 ............................................................................ 10

§ 400.02(2) ............................................................... 6-7, 25

§ 400.03 ........................................................... 10, 22, 25

§ 400.03(1) ........................................................................ 6

§ 400.03(3) ................................................................... 6-7

§ 400.03(7) ................................................................... 7, 22

§ 400.03(7)-(8) ..................................................... 10, 17

§ 400.03(8) ................................................................. 6, 21

State Finance Law

§ 99-pp(3) ................................................................. 8, 37

§ 99-pp(5) ................................................................. 8, 37

## Other State Statutes

1884-85 Ala. Laws 604 ............................................... 40

1826 Conn. Pub. Acts 107 .......................................... 40

1869 Del. Laws 360 ...................................................... 39

1838 Fla. Laws 36 ................................................... 39-40

1893 Ga. Laws 514 ...................................................... 40

1820 N.H. Laws 275 ............................................... 39-40

1776 N.J. Acts 6-7 .................................................. 39-40

1883 Ohio Laws 134 ............................................... 39-40

1778 Pa. Laws 126 ........................................................ 31

1789 R.I. Pub. Laws 7 .................................................. 38

1891 S.C. Acts 1101-02 ............................................... 40

1895 Va. Acts 849-50 ................................................... 41

vi

| **Miscellaneous Authorities** | **Page(s)** |

Commissioners of Statutory Revision, *Colonial Laws of New York from the Year 1664 to the Revolution* (1894)...............30

Hennig, William Waller, *A Collection of All the Laws of Virginia* (1820) .....................................................................31

## PRELIMINARY STATEMENT

In this case, four individuals and an association challenge the constitutionality of a New York State law requiring a seller of ammunition to obtain a background check on the proposed purchaser as a prerequisite to a lawful sale of ammunition. While the Second Amendment guarantees the right of law-abiding citizens to keep and bear arms, the Supreme Court has made clear that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). Such measures include background checks, which are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (citation omitted).

Consistent with this Supreme Court precedent, New York law requires commercial sellers of ammunition to obtain background checks on would-be purchasers before selling ammunition to them. These checks, performed by the New York State Police upon the request of a seller, ensure that a purchaser is a law-abiding citizen who may lawfully possess ammunition. Like the background checks required by federal law

for the sale of firearms, background checks for the sale of ammunition are conducted at the point of sale and are designed to be instantaneous. New York imposes a modest $2.50 fee on sellers for each such background check, reflecting the cost of the check to State Police. New York law also requires sellers of ammunition to register with State Police.

Plaintiffs brought this action under 42 U.S.C. § 1983 challenging the constitutionality of the laws governing ammunition background checks. Plaintiffs, including the New York State Firearms Association (NYSFA) and four individuals, filed this action on the day the background check requirement came into effect. They sought preliminary injunctive relief based on allegations that the challenged laws violate their Second Amendment right to keep and bear arms. The District Court for the Western District of New York (Geraci, J.) denied plaintiffs' preliminary injunction motion, and plaintiffs appealed.

This Court should either affirm or, if the Court finds that plaintiffs lack standing, vacate the order below and remand with instructions to dismiss the complaint without prejudice. As demonstrated below, plaintiffs failed to establish standing for their Second Amendment claims because they have not shown how the challenged laws impede their

2

ability to keep and bear arms. Further, under this Court's binding precedent, NYSFA lacks standing to assert the Second Amendment rights of its members. Plaintiffs also failed to demonstrate a likelihood of success on the merits of their Second Amendment claim. The ammunition background check requirement does not prevent law-abiding citizens from purchasing ammunition—it merely ensures that purchasers of ammunition are in fact law-abiding citizens. The modest $2.50 fee and registration requirement, both imposed only on commercial sellers of ammunition, likewise do not infringe plaintiffs' right to keep and bear arms. Moreover, as the district court held, the challenged laws fit well within the Nation's history and tradition of firearm regulation.

## ISSUES PRESENTED

1. Whether plaintiffs lack standing to challenge New York State's laws regulating the sale of ammunition because they have not alleged any concrete injury traceable to those laws.

2. Whether plaintiffs have failed to demonstrate a likelihood of success on the merits of their Second Amendment claim either because (a) the challenged laws merely impose conditions and qualifications on the commercial sale of arms without impeding the ability of law-abiding

citizens to keep and bear arms, or (b) the laws are consistent with the Nation's history and tradition of preventing people who have been identified as dangerous from possessing arms and ammunition.

3.      Whether plaintiffs failed to demonstrate irreparable harm absent an injunction or that the public interest weighs in favor of an injunction.

## STATEMENT OF THE CASE

### A.      Statutory Background

### 1.      Firearm background checks

The state ammunition background check laws challenged here were enacted against the backdrop of federal law that we summarize below. Federal law prohibits certain categories of individuals—including convicted felons and those adjudicated as mentally ill—from possessing firearms and ammunition. *See* 18 U.S.C. § 922(g). Federal law also prohibits the sale of firearms and ammunition to such individuals. *Id.* § 922(d). State law imposes similar prohibitions on various categories of individuals, including those subject to an extreme risk protection order. *See* N.Y. C.P.L.R. article 63-A.

To prevent such potentially dangerous individuals from obtaining firearms, federal law requires federally licensed firearm dealers—known as Federal Firearm Licensees (FFLs)—to obtain background checks on potential purchasers before selling firearms to them. *See* 18 U.S.C. § 922(t). In New York State, these firearm background checks are performed at the point of sale by State Police, at the request of sellers, using the National Instant Criminal Background Check System (NICS).[1] (A48.) New York law extends this background check requirement to all firearm dealers, whether or not they are FFLs. *See* N.Y. General Business Law § 898.

New York State Police serves as a state point-of-contact for background checks on firearms sales. *See* N.Y. Executive Law § 228. That means firearm dealers contact State Police to search the NICS database as well as a statewide firearms license and records database for any disqualifying records concerning potential purchasers, such as felony convictions or extreme risk protection orders. *Id.* § 228(1)(b). If the

---

[1] NICS is an electronic system maintained by the Federal Bureau of Investigation that checks the names of prospective purchasers of firearms against databases containing information about individuals who may not lawfully purchase arms or ammunition.

5

automated search locates no potentially disqualifying record, then State Police sends a "proceed" response to the dealer. Otherwise, State Police sends a "delay" response and manually reviews the potentially disqualifying record. State Police determines whether to allow the transaction to proceed or to issue a "deny" response to the firearm dealer. (A49.) A denial may be appealed administratively and ultimately challenged in court. *See* Executive Law § 228(8); C.P.L.R. article 78.

### 2. Ammunition background checks

Although federal law does not require a background check for the sale of ammunition, New York, like at least one other state (California), has enacted such a requirement. Pursuant to both the Secure Ammunition and Firearms Enforcement Act (SAFE Act), enacted in 2013, *see* Ch. 1, 2013 N.Y. Laws, and the Concealed Carry Improvement Act (CCIA), enacted in 2022, *see* Ch. 371, 2022 N.Y. Laws, sellers of ammunition must obtain background checks on their proposed purchasers at the point of sale. *See* N.Y. Penal Law §§ 400.02(2), 400.03(3). State law also requires sellers of ammunition (other than licensed firearm dealers) to register with the Superintendent of the State Police, *id.* § 400.03(1); a seller who fails to do so is subject to a $1,000 fine, *id.* § 400.03(8). "Seller

6

of ammunition" is defined as "any person, firm, partnership, corporation or company who engages in the business of purchasing, selling or keeping ammunition." *Id.* § 265.00(24). State law further prohibits any "commercial transfer of ammunition" unless a licensed firearm dealer or registered seller of ammunition acts as an intermediary between the transferor and ultimate transferee and, in that role, obtains the required background check on the transferee. *Id.* § 400.03(7).

The ammunition background check is modeled after the firearm background check. (A49-50.) The seller of ammunition contacts State Police, which searches the statewide license and record database (though not the NICS database) for potentially disqualifying records. Penal Law §§ 400.02(2), 400.03(3). Like the firearm background check, the ammunition background check is intended to instantaneously generate a "proceed" or "delay" response. A "delay" response leads to the same internal review process. (A49-50.) This ammunition background check requirement has been in effect since September 13, 2023. (A45.) Between September 13 and October 9, 2023, State Police processed 29,464 ammunition background check requests, of which 29,037—98.6%—were approved. (A50.)

7

State law also requires the seller to pay a fee for obtaining firearm and ammunition background checks. *See* Executive Law § 228(5)(a). (A47). "The amount of the fee shall not exceed the total amount of direct and indirect costs incurred by [State Police] in performing [each] background check." Executive Law § 228(5)(a). Fees are allocated to the background check fund and may be used only "for the direct costs associated with performing background checks." N.Y. State Finance Law § 99-pp(3). If the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee." *Id.* § 99-pp(5). State Police has set the background check fee at $9.00 for a firearm transaction and $2.50 for an ammunition transaction; these amounts are "not expected to exceed the costs of implementing and operating the New York State background check system." (A45.)

## B.   Procedural History

Plaintiffs filed this lawsuit on September 13, 2023—the day the ammunition background check requirement came into effect—in the United States District Court for the Western District of New York. (*See* A4.) Plaintiffs include NYSFA and four individuals: George Borrello,

8

David DiPietro, William Ortman, and Aaron Dorr. (A12-13.) Borrello and DiPietro are members of the New York State Legislature who voted against the CCIA. (A12.) Ortman is a member of NYSFA (A12), and Dorr is the association's executive director (A13). Plaintiffs filed an amended complaint two days later, on September 15.

The amended complaint asserts that the individual plaintiffs are harmed by the ammunition background check requirement and $2.50 fee because they refuse to buy ammunition subject to those conditions. For example, the complaint alleges that both Borrello and DiPietro are "law-abiding firearm owner[s]" and would purchase ammunition "[b]ut for the background check and associated fee." (A12, 16.) Additionally, the complaint alleges that Ortman attempted to purchase ammunition from a retailer on September 13 but "declined to proceed when confronted with the background check and when he was informed that he would be responsible for paying the fee required [to] conduct the background check." (A16.) "But for the background check and associated fee," the complaint alleges, "Mr. Ortman would have purchased the ammunition and would make purchases in the future." (A16-17.) Ortman also alleged that he would buy $8 worth of ammunition from DiPietro, but if DiPietro

9

sold ammunition without registering with State Police, he would be subject to a $1,000 fine under Penal Law § 400.03(7)-(8). (A17.)

The complaint further alleges that Dorr attempted to purchase ammunition from two retailers on September 14 but "could not make the purchase[s] because the statewide license and record database was not working and so the store[s] could not legally sell ammunition." (A17.) "But for what he believes will be further failure of the statewide license and record database," the complaint alleges, "Dorr would make future purchases, though with far less frequency owing to the burden of enduring a background check." (A17.)

The amended complaint names then-Acting Superintendent of State Police Steven Nigrelli as the sole defendant. (A13.) Nigrelli was later substituted by Acting Superintendent Dominick Chiumento. (A7.) Plaintiffs' claim against the Superintendent is based on his obligations "to implement and oversee background checks for ammunition sales." (A13.) Plaintiffs challenge the background check requirement for ammunition sales, *see* Penal Law §§ 400.02, 400.03; Executive Law § 228, and the fee to conduct an ammunition background check, *see* Executive Law § 228(5)(a), as infringing their right to bear arms. (A18.)

10

Plaintiffs moved for a temporary restraining order (TRO) and preliminary injunction on the same day, September 15, 2023, they filed their amended complaint. (A21.) In support of their motion, plaintiffs relied on the allegations in the complaint. (A24.) In addition, Dorr provided photographs purportedly taken on September 14 at a Runnings store in Canandaigua. (A27.) These photographs show signs stating that guns and ammunition sales are closed because of training and because "E-NICS is down." (A29-30.)

After the district court denied plaintiffs' request for a TRO (A35-43), the Superintendent opposed the preliminary injunction motion. He argued that plaintiffs lack standing and that the challenged laws do not implicate the Second Amendment because they do not infringe plaintiffs' right to keep and bear arms. Then-Acting Superintendent Dominick Chiumento provided a declaration explaining how the ammunition background check system functions in practice. (A44-52.) The Superintendent also cited dozens of historical laws, from the colonial era to the 19th century, regulating the possession and sale of arms and ammunition. These laws prohibited the sale of ammunition to people perceived to be dangerous (A80-111); disarmed people perceived to be dangerous (A112-

11

127); required citizens to pledge allegiance to the United States and disarming them if they refused to do so (A128-153); imposed taxes and fees on the sale of arms and ammunition (A154-181, 184, 252, 275, 324-325, 328-329); and imposed licensing requirements on sellers of arms and ammunition (A184, 268-279, 283-315, 324-325, 328-329, 333-334).

The district court denied a preliminary injunction in May 2024. The court held that NYSFA lacks standing to assert § 1983 claims on behalf of its members, but that the individual plaintiffs had standing to challenge the background check, fee, and registration requirements. (SA5-10.) On the merits of plaintiffs' Second Amendment claim, the court held that plaintiffs' conduct—the purchase of ammunition—is "presumptively protected by the Second Amendment." (SA12.) The court thus conducted a historical analysis to determine whether the challenged laws are consistent with the Nation's historical tradition of firearm regulation.

The district court held that each of the challenged laws satisfies *Bruen*'s history-and-tradition test. First, the court held, the ammunition background check requirement is consistent with "the well-recognized historical tradition of preventing dangerous individuals from possessing weapons." (SA12 (quoting *Antonyuk v. Chiumento*, 89 F.4th 271, 307 (2d

12

Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (2024)).) By way of evidence, the court discussed one of the many historical analogues the Superintendent had offered: a colonial Virginia law disarming Catholics who were perceived to be dangerous, but allowing some to keep their arms if they took an oath of loyalty. (SA13.) The court further held that "states are permitted to employ mechanisms to 'ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.'" (SA14 (quoting *Bruen*, 597 U.S. at 38 n.9).) And background checks, like loyalty oaths, are "pre-purchase burdens employed to confirm" future good behavior by gunowners. (SA14.) The court rejected plaintiffs' argument, unsupported in the record, that ammunition background checks result in unreasonably lengthy wait times or are put toward abusive ends. (SA15-16.)

Second, the court held that "the requirement that a seller of ammunition be licensed or that commercial ammunition transfers involve a licensed dealer" was consistent with "[t]he historical tradition of requiring a seller of ammunition or firearms to be licensed." (SA17.) The court discussed an 1838 Florida law imposing a similar licensing requirement on sellers of guns and ammunition. (SA17.)

13

Third, the court held that the $2.50 fee for a background check comports with this Court's fee jurisprudence. The court cited this Court's decision in *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), upholding a $340 fee for a handgun license because the fee merely defrayed the administrative cost of processing the license. Here, by law, fee revenue may be used only to defray State Police's cost of conducting the background check, and the amount of the fee may not exceed that cost. (SA18-19.) The court thus held that plaintiffs had failed to demonstrate a likelihood of success on the merits of their claim. The court did not reach the other requirements for a preliminary injunction, namely irreparable harm and the public interest. (SA19-20.)

Plaintiffs appealed. (A378.)

## STANDARD OF REVIEW

On appeal from an order denying preliminary injunctive relief, this Court reviews the district court's legal holdings de novo and its ultimate decision for abuse of discretion. *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021).

14

## SUMMARY OF ARGUMENT

Plaintiffs are not entitled to a preliminary injunction for any of three reasons. First, plaintiffs lack standing because they have failed to demonstrate any concrete injury traceable to the challenged laws. Plaintiffs allege that they would purchase ammunition "but for" the ammunition background check that sellers must obtain, but they do not attribute this result to any obstacle or burden posed by the background check. In the absence of any such allegation, their refusal to purchase ammunition appears to be no more than a personal choice, which cannot establish standing. In any event, the challenged laws do not impede plaintiffs' ability, as law-abiding citizens, to purchase ammunition. Finally, under this Court's binding precedent, NYSFA lacks standing to challenge the laws under § 1983 on behalf of its members.

Second, plaintiffs have failed to show a likelihood of success on the merits of their Second Amendment claim because the challenged laws impose modest conditions and qualifications on the commercial sale of ammunition. Accordingly, they are presumptively lawful regulatory measures that do not implicate the plain text of the Second Amendment. And even if the Second Amendment did apply, the challenged laws are

15

constitutional because they comport with the Nation's history and tradition of preventing people identified as dangerous from possessing arms and ammunition.

Third, plaintiffs have failed to demonstrate irreparable harm (or, indeed, any harm at all) due to the ammunition background check, fee, and registration requirements imposed on sellers of ammunition. And the balance of the equities weighs against preliminarily enjoining these public safety laws that prevent potentially dangerous people from purchasing ammunition.

## ARGUMENT

### POINT I

#### PLAINTIFFS LACK STANDING TO CHALLENGE THE AMMUNITION BACKGROUND CHECK, FEE, AND REGISTRATION REQUIREMENTS

This Court should vacate the order below and remand with instructions to dismiss the complaint for lack of standing. "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting

16

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and quotation marks omitted).

## A.   The Individual Plaintiffs Lack Any Concrete Injury Traceable to the Challenged Laws.

The individual plaintiffs have failed to demonstrate any concrete injury traceable to the ammunition background check, the associated $2.50 fee imposed on the ammunition retailer, and the requirement that sellers of ammunition be licensed or registered with State Police. The complaint alleges only that (1) Borrello, DiPietro, and Ortman would purchase ammunition from a retail store but for the background check and associated fee; (2) that Dorr would purchase ammunition from a retail store "[b]ut for what he believes will be further failure of the statewide license and record database"; and (3) that Ortman would buy ammunition from DiPietro but for the alleged threat of a $1,000 fine under Penal Law § 400.03(7)-(8). (A16-17.)

As for the first asserted injury, Borrello, DiPietro, and Ortman fail to allege that their non-purchase of ammunition is traceable to any

17

obstacle posed by the challenged requirements. In the absence of such an allegation, this result appears to reflect no more than their personal choices to refrain from purchasing ammunition when they know the seller will obtain a background check and pay a fee. It is well settled that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Nor does a plaintiff have "standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Thus, Borrello, DiPietro, and Ortman's mere refusal to purchase ammunition cannot support standing.

More fundamentally, these plaintiffs have not offered any evidence to show that the challenged laws in any way impede their acquisition of ammunition. Although plaintiffs assert harm to their interest as purchasers, these laws place no obligations whatsoever on *purchasers* of ammunition. They simply require *sellers* of ammunition to register as such, to obtain background checks from State Police in connection with the sale of ammunition, and to pay a $2.50 fee to State Police for each such background check. And any impact of the laws on purchasers is too

18

indirect and speculative to support standing. Although plaintiffs allege that sellers routinely pass along the $2.50 fee to their customers, they do not claim that they cannot pay this amount. Nor do they allege that they would fail a background check were they to undergo one. *See United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) (plaintiff lacked standing to challenge eligibility criteria governing firearm licensing scheme because he neither applied for license nor showed that application would be futile).

For similar reasons, this Court, in an unpublished decision, denied standing to plaintiffs who complained about being subject to a firearm background check. *See Robinson v. Sessions*, 721 F. App'x 20 (2d Cir. 2018). The plaintiffs in *Robinson*, like plaintiffs here, failed to "explain how they *themselves* have been subjected to any harm by the challenged conduct." *Id.* at 23. There was no evidence, for example, that the plaintiffs "were unable to purchase a firearm" or "were delayed in purchasing a firearm." *Id.* at 23-24; *see also Lee v. U.S. Dep't of Just.*, 554 F. Supp. 3d 1228, 1235 (N.D. Ala. 2021) (holding that plaintiff lacked standing to challenge firearm background check because there was no evidence that plaintiff was "denied the opportunity to purchase a firearm"). The

19

plaintiffs in *Robinson* also could not rely on the "speculative theory" that they may one day experience "a delay or denial in their transaction." 721 F. App'x at 24. Nor could they challenge the firearm background check because of allegedly unconstitutional defects that did not affect them; as the Court explained, Article III does not permit "citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws." *Id.* at 23 (quoting *Lujan*, 504 U.S. at 581).

Here too, plaintiffs fail to explain how they themselves have been subjected to any harm by the challenged laws. The district court, in finding standing, relied on this Court's decision in *Antonyuk* for the proposition that "plaintiffs are not required to seek and be refused ammunition before challenging the constitutionality of the background check" (SA8), but that reliance is misplaced. Plaintiffs in *Antonyuk* objected to the substantive criteria for obtaining a carry permit that required them to make certain disclosures to the State. They asserted that these requirements deterred them from exercising their Second Amendment rights. *Antonyuk*, 89 F.4th at 308-09. But plaintiffs here have not raised any objection to the disclosure of information in connection with the ammunition background check; indeed, as

20

purchasers of firearms, they presumably have *already* submitted to the background check required by federal and state law for firearm transfers. Plaintiffs have simply failed to articulate any concrete injury traceable to the ammunition background check and associated fee.

Plaintiffs' remaining assertions of injury are also insufficient to establish standing. The allegation that Dorr would purchase ammunition from a retail store "[b]ut for what he believes will be further failure of the statewide license and record database" (A17) is based solely on speculation about future technical issues. Dorr does not have standing based on "fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

Nor does Ortman have standing to challenge the registration law based on his allegation that the $1,000 fine for unregistered sales of ammunition will deter DiPietro from selling ammunition to him. DiPietro does not allege that he is "engage[d] in the business of purchasing, selling or keeping ammunition," which is the definition of a "seller of ammunition" who is required to register under the law. Penal Law §§ 400.03(8), 265.00(24). And the proposed transaction—an $8 purchase of ammunition between acquaintances—would not qualify as a "commercial trans-

21

fer of ammunition" requiring a licensed dealer of firearms or registered seller of ammunition to serve as an intermediary. *See id.* § 400.03(7). Because plaintiffs have failed to allege that Penal Law § 400.03 would govern DiPietro's transfer of a small amount of ammunition to Ortman, that Penal Law provision cannot give Ortman standing to challenge the registration law as violating his Second Amendment rights.

### B. NYSFA Lacks Standing to Assert Claims on Behalf of Its Members.

Like the named plaintiffs, NYSFA lacks standing. Preliminarily, NYSFA does not purport to sue on its own behalf, and there is no evidence that the association can "independently satisfy the requirements of Article III standing." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 388 (2d Cir. 2015). Rather, NYSFA seeks to assert the Second Amendment rights of its members. (A17-18; Br. 10-16.)

This Court has held that an association lacks standing to assert the rights of its members in an action brought under 42 U.S.C. § 1983 because the civil rights secured by § 1983 are personal to those who are injured. *See Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021); *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).

Plaintiffs point to no intervening Supreme Court precedent overruling these decisions. Thus, this Court's binding precedent forecloses NYSFA's claim on behalf of its members.

## POINT II

### PLAINTIFFS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE

If the Court reaches the merits, it should affirm the denial of a preliminary injunction. As the district court correctly held, plaintiffs have failed to demonstrate a likelihood of success on the merits of their Second Amendment claim. Plaintiffs cannot establish that the challenged laws are unconstitutional in all their applications, as they must in this facial challenge.[2] *See United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

---

[2] While plaintiffs argue to this Court that the ammunition background check requirement is also unconstitutional as applied (*see* Br. 42-45), they made no such claim below. Nor have they explained on appeal how plaintiffs in particular—as opposed to other law-abiding citizens—have suffered an infringement of their right to keep and bear arms. The Court should reject plaintiffs' effort to raise for the first time on appeal an unpleaded, unsupported as-applied claim.

A.   **Modest Conditions and Qualifications on the Commercial Sale of Ammunition Do Not Implicate the Text of the Second Amendment.**

Plaintiffs' challenge fails at the outset because the ammunition background check, fee, and registration requirements merely impose modest conditions and qualifications on the commercial sale of ammunition and therefore do not implicate the text of the Second Amendment.

The Second Amendment provides that "the right of the people to keep and bear Arms[] shall not be infringed." U.S. Const. amend. II. This clause "guarantees the individual right to possess and carry weapons in case of confrontation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). In recognizing this individual right, the Supreme Court has "observed several limitations on the right." *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023). As relevant here, the Court has observed that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast

24

doubt on such longstanding regulatory measures as . . . 'laws imposing conditions and qualifications on the commercial sale of arms.'").

The ammunition background check, associated fee, and registration requirements for sellers of ammunition are quintessential examples of conditions and qualifications on the commercial sale of arms. They are imposed only on sellers of ammunition and apply only to commercial transactions. *See* Penal Law §§ 400.02(2), 400.03. And while *Bruen* left open the possibility of constitutional challenges where "lengthy wait times" or "exorbitant fees deny ordinary citizens their right to public carry," 597 U.S. at 38 n.9, the challenged laws on their face impose no such burdens; the ammunition background checks are designed to be instantaneous and cost retailers only a modest $2.50 per transaction. The record also reflects that the vast majority of ammunition transactions are quickly approved. (A50.) Anecdotal examples of occasional technical issues with the background check system do not show that the system is "put toward abusive ends." *Bruen*, 597 U.S. at 38 n.9. Thus, the challenged laws on their face do not infringe the right to keep and bear arms.

In holding to the contrary (SA12), the district court overlooked that commercial regulations on the sale of firearms do not implicate the conduct protected by the plain text of the Second Amendment—the personal right to keep and bear arms—unless they are so restrictive as to eliminate or severely curtail access to firearms. *See Gazzola*, 88 F.4th at 196; *United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024).

Recent decisions from the Fifth and Fourth Circuits illustrate why the district court should have held that the challenged laws do not come under the Second Amendment and thus are not subject to *Bruen*'s history-and-tradition test. In *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), the Fifth Circuit affirmed the denial of a preliminary injunction in a challenge to the federal background check requirement for firearm sales. As the court explained, those federal law provisions "fit comfortably within the regulatory measures the Supreme Court has approved." *Id.* at 839. And even a 10-day delay in processing firearm transactions did not show that the background check requirement was "'put towards abusive ends' or subject to *Bruen*'s historical framework as a de facto prohibition on possession." *Id.* at 840.

26

Likewise, in *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc), the Fourth Circuit upheld Maryland's background check requirement for handgun qualification licenses. The court rejected the argument that "*any* delay resulting from compliance with" the statute qualified as infringement. *Id.* at 226. And the court rejected the claim that the statute was "abusive" and duplicative merely because another provision of state law required background checks at the time of purchasing a firearm. *Id.* at 227-28. Thus, the plaintiffs failed to show that the challenged background check requirement infringes the Second Amendment right to keep and bear arms, and the court did not reach the argument concerning whether the law has a historical analogue. *Id.* at 229.

Also instructive are two recent cases involving a federal law prohibiting the making of false statements in connection with the acquisition of a firearm. *See* 18 U.S.C. § 922(a)(6); *United States v. Scheidt*, 103 F.4th 1281 (7th Cir. 2024); *Manney*, 114 F.4th 1048. Both the Seventh and Ninth Circuits rejected the criminal defendants' Second Amendment challenges to that statute because it did not prevent the defendants from possessing firearms. As the Ninth Circuit explained, "the regulated

27

*conduct*"—making false statements—was "unrelated to the possession of a firearm." *Manney*, 114 F.4th at 1053. "Because the Second Amendment does not protect an individual's false statements," the Ninth Circuit explained, the regulated conduct "falls outside the scope of the Second Amendment's plain text." *Id.*; *accord Scheidt*, 103 F.4th at 1284 ("Completing ATF Form 4473, and adhering to its attendant truth-telling requirement, is conduct that is outside the scope of the Second Amendment's protections, not requiring application of *Bruen*'s historical analysis framework.").

The Seventh Circuit in *Scheidt* further rejected the argument that ATF Form 4473, a firearm transaction record that must be filled out at the time of purchase, is "akin to a condition precedent that imposes an unconstitutional barrier to individual gun possession." 103 F.4th at 1284. As the court explained, the form merely "helps screen for purchasers who run afoul of regulations informing who may lawfully possess a firearm and what kind of firearm that person may possess." *Id.* Thus, there was no need "to determine whether our nation has a history and tradition of requiring the completion of registration forms prior to sale." *Id.*

Like the firearm background check requirements at issue in *McRorey* and *Maryland Shall Issue* and the prohibition against false statements and the transaction record at issue in *Manney* and *Scheidt*, the requirements at issue here—that sellers obtain an ammunition background check, pay a small associated fee, and register as sellers—do not prevent or impede the exercise of Second Amendment rights. These measures are imposed only on sellers of ammunition, whose conduct does not fall within the scope of the Second Amendment. *See Manney*, 114 F.4th at 1053. And the measures merely require sellers to screen potential buyers to ensure that they sell ammunition only to those who may lawfully possess it. *See Scheidt*, 103 F.4th at 1284. Finally, there is no evidence that these provisions create extraordinary delays in ammunition purchases or otherwise impose unconstitutional conditions on plaintiffs' right to keep and bear arms. *See McRorey*, 99 F.4th at 839; *Maryland Shall Issue*, 116 F.4th at 226-28.

## B. Background Checks, Fees, and Registration Requirements Are Consistent with the Nation's History and Tradition of Firearm Regulation.

Even if the challenged laws did implicate the text of the Second Amendment, they would be constitutional because, as the district court

29

held, the laws are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. In Second Amendment cases, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Courts must "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at 29). "[C]entral to this inquiry" are "[w]hy and how the regulation burdens the right" to keep and bear arms. *Id.* While the government bears the burden of showing that the challenged laws "comport with the principles underlying the Second Amendment," the government need not identify "a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

### 1. Background checks

As the district court held, ammunition background checks are consistent with the historical tradition of preventing certain categories of people—especially those deemed dangerous—from possessing arms. The Superintendent cited numerous examples of colonial-era prohibitions against the sale of ammunition to potentially hostile parties, including Native Americans and the French, *e.g.*, 1 Commissioners of Statutory

30

Revision, *Colonial Laws of New York from the Year 1664 to the Revolution* 40-41 (1894) (*see* A80-111); colonial-era disarmament laws prohibiting possession of ammunition by members of groups perceived to be dangerous, including dissident Protestants, Native Americans, and Catholics, *e.g.*, VII William Waller Hennig, *A Collection of All the Laws of Virginia* 35 (1820) (*see* A112-127); and founding-era loyalty laws requiring citizens to pledge allegiance to the United States and disarming them if they refused to do so, *e.g.*, 1778 Pa. Laws 126 (*see* A128-153).

The Supreme Court in *Rahimi* also canvassed numerous firearm regulations "[f]rom the earliest days of the common law" that "included provisions barring people from misusing weapons to harm or menace others." 144 S. Ct. at 1899. For example, surety laws in England and in the early Republic "authorized magistrates to require individuals suspected of future misbehavior to post a bond," which would be forfeit if the individual broke the peace. *Id.* at 1900. Massachusetts's surety law explicitly authorized "the imposition of bonds from individuals '[who went] armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon.'" *Id.* (quoting Mass. Rev. Stat., ch. 134, § 16). The Court also cited "going armed laws" which "provided a mechanism for

punishing those who had menaced others with firearms," including disarmament. *Id.* at 1900-01. The Court deemed the federal statute prohibiting possession of firearms by individuals subject to a domestic violence restraining order, *see* 18 U.S.C. § 922(g)(8), as relevantly similar to these founding-era laws.

New York's ammunition background check requirement is "relevantly similar" to these historic laws "in both why and how it burdens the Second Amendment right." *Rahimi*, 144 S. Ct. at 1901. Like the colonial- and founding-era restrictions on the sale of ammunition, disarmament laws, and loyalty oaths, background checks are designed to keep ammunition out of the hands of potentially dangerous individuals. The founding-era surety laws and going armed laws discussed in *Rahimi* also were motivated by the relevantly similar purpose of preventing dangerous people from possessing firearms. *See Maryland Shall Issue*, 116 F.4th at 233 (Rushing, J., concurring) (observing that Maryland's handgun qualification license, like shall-issue regimes and background checks generally, are consistent with the historical tradition of prohibiting dangerous people from possessing firearms). Thus, as in *Rahimi*, the purpose of the laws challenged here and many of the Nation's historic

firearm regulations is the same. Indeed, the background check allows sellers to determine whether a law such as the one in *Rahimi* bars a potential buyer from possessing ammunition.

The mechanism by which this purpose is effectuated is also relevantly similar to historic laws. Like the loyalty oaths and surety laws, background checks are prophylactic measures, taken prior to transfer and tailored to prevent potentially dangerous individuals from misusing arms. *See Rahimi*, 144 S. Ct. at 1901 (holding that the federal law "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent"); *United States v. Diaz*, 116 F.4th 458, 470 (5th Cir. 2024) (upholding federal law prohibition on possession of firearms by convicted felons based on "colonial-era statutes that prohibited going armed offensively and authorized forfeiture of weapons as punishment"). The ammunition background check requirement, like loyalty and surety laws, broadly applies to gunowners but does not "broadly restrict arms use by the public generally." *Rahimi*, 144 S. Ct. at 1901. To the extent ammunition background checks burden an individual's right to keep and bear arms, they do so only to ensure that "those bearing arms in the

jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).

Plaintiffs do not seriously contest that the ammunition background check requirement is similar to historic regulations in *why* it burdens the right to keep and bear arms. Plaintiffs concede that "dangerous people may be disarmed or subject to additional vetting" without offending Second Amendment principles. (Br. 33.) That is precisely what the ammunition background check accomplishes: it prevents potentially dangerous people from purchasing ammunition, or at least subjects them to additional vetting by State Police. And while plaintiffs claim that the laws are similar only "at a high enough level of generality" (Br. 35), *Rahimi*'s analysis reflects that same level of generality. Founding-era surety laws and going armed laws are as similar to background checks as they are to the federal law prohibiting possession of firearms by individuals subject to a domestic violence restraining order. The same purpose of keeping arms out of the hands of potentially dangerous people motivates the historic laws cited above, the federal law restriction upheld in *Rahimi*, and the ammunition background check requirement at issue here.

Plaintiffs' argument that the ammunition background check requirement differs from historic laws in *how* it burdens the Second Amendment is meritless. Preliminarily, the background check requirement is "by no means identical" to these historic restrictions, "but it does not need to be." *Rahimi*, 144 S. Ct. at 1901. It is relevantly similar to historic laws in that it prevents potentially dangerous people from purchasing ammunition without burdening law-abiding citizens more broadly. *See id.* Moreover, the challenged law does not "treat average, law-abiding citizens, such as the Plaintiffs, as suspect, dangerous people who must receive the official blessing of the state to obtain ammunition." (Br. 37.) Law-abiding citizens are free to purchase ammunition *unless* the background check reveals a potentially disqualifying record, such as a felony conviction. Indeed, if the government may prohibit dangerous people from purchasing arms and ammunition, as plaintiffs appear to acknowledge, a reasonable way to enforce that prohibition is by requiring sellers to verify whether purchasers are subject to any disqualifying condition. That is why federal law requiring background checks for firearm purchases comports with the Second Amendment. If firearm

background checks are constitutional—and plaintiffs do not contend otherwise—then so are ammunition background checks.

Finally, plaintiffs' claim that ammunition background checks are "unnecessarily duplicative" of firearm background checks (Br. 36) fails for at least two reasons. First, as a matter of law, the relevant question is not whether background checks are necessary, but whether they comport with the Nation's historical tradition of firearm regulation. For all the reasons explained above, ammunition background checks fit well within the Nation's history of preventing dangerous people from possessing arms and ammunition. Second, plaintiffs are wrong as a matter of fact, because when an ammunition purchase and a firearm purchase are made at separate times, the ammunition background check is not duplicative. An individual may have been subject to a disqualifying event, such as a felony conviction, between the time he lawfully purchased a firearm and the time he later attempts to purchase ammunition. An individual also may have acquired a firearm unlawfully, without having undergone a background check. If that individual then attempts to purchase ammunition, a background check serves as an additional prophylactic measure that could prevent him from unlawfully doing so.

36

## 2. Fee

The modest $2.50 fee for ammunition background checks, imposed on sellers of ammunition, also comports with the principles underlying the Second Amendment. This fee may be used only to defray "the direct costs associated with performing background checks." State Finance Law § 99-pp(3). And the amount of the fee may "not exceed the total amount of direct and indirect costs incurred by [State Police] in performing [each] background check." Penal Law § 228(5)(a). The current amount—$2.50— is "not expected to exceed the costs of implementing and operating the New York State background check system." (A45.) But if the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee." State Finance Law § 99-pp(5).

This fee plainly passes constitutional muster. In *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), this Court upheld New York City's $340 handgun licensing fee because it was "designed to defray (and [did] not exceed) the administrative costs associated with the licensing scheme." *Id.* at 166. The Court's holding was based on analogous authority in the First Amendment context, where "the Supreme Court

37

has held that governmental entities may impose licensing fees relating to the exercise of constitutional rights when the fees are designed 'to meet the expense incident to the administration of the licensing statute and to the maintenance of public order in the matter licensed.'" *Id.* at 165 (quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)). By law, the ammunition background check fee comports with this limitation.

Nothing in *Bruen* undermines the Supreme Court's long-settled fee jurisprudence. Instead, the majority opinion is consistent with the proposition that regulatory fees remain constitutional, noting only that the Court "do[es] not rule out constitutional challenges" if "exorbitant fees deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9. Plaintiffs make no showing that the $2.50 fee at issue here meets that high standard.

Moreover, the ammunition background check fee fits well within the Nation's historical tradition of firearm regulation. In the district court, the Superintendent cited several laws from the colonial era onward that imposed taxes on gun and ammunition sales. (A154-181, 252.) For example, in 1789, Rhode Island imposed a 10% ad valorem tax on gunpowder imports. *See* 1789 R.I. Pub. Laws 7 (A163). And in 1869,

38

Delaware enacted a percentage tax on gross sales made by manufacturers of gunpowder. *See* 1869 Del. Laws 360 (A252). The Superintendent also cited laws imposing fees on sellers of arms and ammunition. In 1776, for example, New Jersey passed a law imposing fees on gunpowder sales which were used to fund inspections. *See* 1776 N.J. Acts 6-7 (A324-325); *see also* 1820 N.H. Laws 275 (A328-329) (similar inspection fee). In 1838, Florida passed a law imposing a $200 annual fee on sellers of certain firearms. *See* 1838 Fla. Laws 36 (A184). And in 1883, Ohio imposed a $100 annual fee on "keepers or owners of gunpowder magazines." *See* 1883 Ohio Laws 134 (A275). The challenged statute is relevantly similar to these historic laws in why it burdens Second Amendment activity—to raise revenue—and in how it does so—by imposing a modest fee on retailers. If anything, the ammunition background check fee imposes less of a burden than many of these historic laws, both in terms of its amount and in that it merely defrays the administrative cost of conducting the check. The $2.50 fee therefore is constitutional.

### 3. Registration requirement

The requirement that sellers of ammunition register with State Police likewise comports with the principles underlying the Second

Amendment. Preliminarily, plaintiffs challenge this requirement only insofar as it prevents plaintiff DiPietro from selling $8 of ammunition to plaintiff Ortman. (Br. 41.) As explained *supra* Point I.A, plaintiffs failed to allege that New York law requires DiPietro to register as a seller of ammunition to make this minor transaction with his co-plaintiff.

In any event, the registration requirement has historical analogues in 19th century laws requiring licenses for the commercial sale of arms and ammunition. For example, in 1826, Connecticut enacted a law empowering the City of New Haven to prohibit the sale of gunpowder without obtaining a license from the city. *See* 1826 Conn. Pub. Acts 107 (A333-334). In 1838, as noted, Florida imposed a $200 fee on sellers of certain firearms in exchange for "a written certificate, stating that they have complied with the provisions of this act." 1838 Fla. Laws 36 (A184). Additionally, gunpowder sales were subject to required inspections in New Jersey and New Hampshire. *See* 1776 N.J. Acts 6-7 (A324-325); 1820 N.H. Laws 275 (A328-329). And at least five states enacted licensing requirements on sellers of arms or ammunition within three decades of the adoption of the Fourteenth Amendment. *See* 1883 Ohio Laws 134; 1884-85 Ala. Laws 604; 1891 S.C. Acts 1101-02; 1893 Ga. Laws 514; 1895

Va. Acts 849-50. (*See* A268-279, 283-315.) Licensing requirements on sellers of ammunition thus fit neatly within the Nation's historic tradition of firearm regulation.

## POINT III

### PLAINTIFFS FAILED TO DEMONSTRATE IRREPARABLE HARM ABSENT AN INJUNCTION OR THAT AN INJUNCTION IS IN THE PUBLIC INTEREST

Plaintiffs have not satisfied the other prerequisites for a preliminary injunction. "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation and quotation marks omitted). To satisfy this requirement, a plaintiff "must demonstrate that absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (citation and quotation marks omitted).

Plaintiffs have shown no irreparable harm—or, indeed, any harm at all—traceable to the challenged laws. Plaintiffs allege that they are

41

law-abiding citizens who lawfully possess firearms. (A12-13.) As such, plaintiffs should be able to pass an ammunition background check without difficulty. And plaintiffs' fear that they will be unable to purchase ammunition because of technical issues with the background check system is too speculative to support injunctive relief. Plaintiffs' concern is also belied by record evidence demonstrating the number of background checks processed by State Police. Between September 13 and October 9, 2023, alone, State Police processed 29,464 ammunition background checks, over 98.6% of which were approved. (A50.)

Finally, the balance of equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh against enjoining the mandatory use of the background check system. At this point, more than a year after the ammunition background check requirement came into effect, an injunction would be severely disruptive. The ammunition background check system is working effectively to protect New Yorkers: in just the three weeks after the laws came into effect, the system prevented over 150 instances where prohibited persons would have gained access to ammunition, in violation of federal or state law. (A50-51.) Meanwhile, the

42

absence of a preliminary injunction has a negligible effect on plaintiffs and other law-abiding citizens, whose right to keep and bear arms is not burdened by the ammunition background check requirement. The equities therefore strongly favor allowing the ammunition background check system to continue protecting New Yorkers' public safety.

## CONCLUSION

For the foregoing reasons, the Court should affirm the order of the district court denying a preliminary injunction or, if the Court finds that plaintiffs lack standing, vacate the order and remand with instructions to dismiss the complaint without prejudice.

Dated:  Albany, New York
October 22, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Defendant-Appellee

By:  */s/ Beezly J. Kiernan*
BEEZLY J. KIERNAN
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
BEEZLY J. KIERNAN
  *Assistant Solicitor General*
    *of Counsel*

The Capitol
Albany, New York 12224
(518) 776-2023

44

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Beezly J. Kiernan, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,223 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Beezly J. Kiernan*
BEEZLY J. KIERNAN