24-1290-cv
*N.Y. State Firearms Ass'n v. James*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2024

(Argued: March 14, 2025    Decided: October 15, 2025)

No. 24-1290-cv

_____

NEW YORK STATE FIREARMS ASSOCIATION, GEORGE BORRELLO,
DAVID DIPIETRO, WILLIAM ORTMAN, AARON DORR,

*Plaintiffs-Appellants,*

— v. —

STEVEN G. JAMES, IN HIS OFFICIAL CAPACITY AS
SUPERINTENDENT OF THE NEW YORK STATE POLICE,

*Defendant-Appellee.*\*

_____

Before:         BIANCO, PARK, and NARDINI, *Circuit Judges.*

Plaintiffs-Appellants New York State Firearms Association ("NYSFA"),
George Borrello, David DiPietro, William Ortman, and Aaron Dorr (the
"individual plaintiffs") (collectively, "Plaintiffs") appeal from the order of the
United States District Court for the Western District of New York (Frank P. Geraci,

_____

\* The Clerk of the Court is respectfully directed to amend the caption on this Court's
docket to be consistent with the caption on this order.

Jr., *Judge*), entered on May 2, 2024, denying Plaintiffs' motion to preliminarily enjoin the enforcement of provisions of New York's Concealed Carry Improvement Act ("CCIA") that require an ammunition seller to (1) conduct a background check on a prospective purchaser of ammunition prior to the sale, (2) pay a $2.50 fee for each background check conducted, and (3) register with the Defendant-Appellee Superintendent of the New York State Police ("Superintendent") (collectively, the "ammunition background check provisions"). The district court first determined that, although NYSFA lacked associational standing, the individual plaintiffs had standing to challenge the ammunition background check provisions under the Second Amendment. It then concluded that Plaintiffs were unlikely to succeed on the merits of their Second Amendment challenges because, under the second step of the framework set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the government demonstrated that the ammunition background check provisions were consistent with the Nation's historical tradition of firearm regulation. On appeal, Plaintiffs argue that the district court erred in determining that NYSFA lacked standing. As to the merits, Plaintiffs contend that the district court erred in concluding that the CCIA's ammunition background check provisions were consistent with our Nation's historical tradition of firearm regulation. For his part, the Superintendent argues that the district court incorrectly found that the individual plaintiffs had standing.

We first conclude that the individual plaintiffs have standing to sue, and so we may proceed to the merits. We hold that, on this record, Plaintiffs have failed to meet their burden of demonstrating that the ammunition background check provisions meaningfully constrain their ability to "keep" or "bear" arms under the first step of the *Bruen* framework. As such, we have no occasion to review the district court's historical analysis at the second step of the *Bruen* framework. We therefore agree with the district court that Plaintiffs have not shown the requisite likelihood of success to warrant a preliminary injunction—albeit for reasons on which the district court did not rely.

Accordingly, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

FOR PLAINTIFFS-APPELLANTS: STEPHEN R. KLEIN
(Benjamin Barr, Barr & Klein PLLC, Chicago,

Illinois, *on the brief*), Barr & Klein PLLC, Washington, District of Columbia.

FOR DEFENDANT-APPELLEE: BEEZLY J. KIERNAN, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Jeffrey W. Lang, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General for the State of New York, Albany, New York.

FOR AMICUS CURIAE: Freya Jamison, Everytown Law, Washington, District of Columbia; Janet Carter and William J. Taylor, Jr., Everytown Law, New York, New York.

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiffs-Appellants New York State Firearms Association ("NYSFA"), George Borrello, David DiPietro, William Ortman, and Aaron Dorr (the "individual plaintiffs") (collectively, "Plaintiffs") appeal from the order of the United States District Court for the Western District of New York (Frank P. Geraci, Jr., *Judge*), entered on May 2, 2024, denying Plaintiffs' motion to preliminarily enjoin the enforcement of provisions of New York's Concealed Carry Improvement Act ("CCIA") that require an ammunition seller to (1) conduct a background check on a prospective purchaser of ammunition prior to the sale, (2) pay a $2.50 fee for each background check conducted, and (3) register with the Defendant-Appellee Superintendent of the New York State Police ("Superintendent") (collectively, the "ammunition background check

3

provisions"). The district court first determined that, although NYSFA lacked associational standing, the individual plaintiffs had standing to challenge the ammunition background check provisions under the Second Amendment. It then concluded that Plaintiffs were unlikely to succeed on the merits of their Second Amendment challenges because, under the second step of the framework set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the government demonstrated that the ammunition background check provisions were consistent with the Nation's historical tradition of firearm regulation. On appeal, Plaintiffs argue that the district court erred in determining that NYSFA lacked standing. As to the merits, Plaintiffs contend that the district court erred in concluding that the CCIA's ammunition background check provisions were consistent with our Nation's historical tradition of firearm regulation. For his part, the Superintendent argues that the district court incorrectly found that the individual plaintiffs had standing.

We first conclude that the individual plaintiffs have standing to sue and so we may proceed to the merits. We hold that, on this record, Plaintiffs have failed to meet their burden of demonstrating that the ammunition background check provisions meaningfully constrain their ability to "keep" or "bear" arms under the

4

first step of the *Bruen* framework. As such, we have no occasion to review the district court's historical analysis at the second step of the *Bruen* framework. We therefore agree with the district court that Plaintiffs have not shown the requisite likelihood of success to warrant a preliminary injunction—albeit for reasons on which the district court did not rely.

Accordingly, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

On July 1, 2022, the New York State Legislature passed the CCIA. As relevant here, the CCIA created a regulatory scheme requiring a seller of ammunition to (1) conduct a background check on a prospective purchaser of ammunition prior to completing the sale, pursuant to N.Y. Penal Law §§ 400.02(2), 400.03(3), and N.Y. Executive Law § 228 (the "background check provisions"); (2) pay a fee to run a background check for each ammunition transaction, pursuant to N.Y. Executive Law § 228(5)(a) (the "fee provision"), and (3) register with the Superintendent or face certain consequences, pursuant to N.Y. Penal Law §§ 400.03(1), (7)–(8) (the "licensing provisions").

The background check provisions require the New York State Police ("NYSP") to create and maintain "a statewide license and record database specific for ammunition sales." N.Y. Penal Law § 400.02(2). The same section provides that a "dealer in firearms" or a "seller of ammunition" may not sell ammunition to a purchaser unless it first "verifie[s] the identity" of the purchaser by examining a valid identification document, and then "contacts the statewide license and record database and provides the database with information sufficient to identify" the purchaser. *Id.*; *see* N.Y. Penal Law § 400.03(3) (similar). In practice, this means that, prior to selling ammunition, a seller will first contact the NYSP and provide it with the purchaser's identifying information. The NYSP will then query its database to determine if the purchaser is prohibited from possessing ammunition under federal law, namely, 18 U.S.C. § 922(g). Under Section 922(g), it is unlawful for individuals in certain prohibited categories to possess a firearm or ammunition, in or affecting commerce, including any person who, *inter alia*: has been convicted of a felony; "is a fugitive from justice"; "is an unlawful user of or addicted to any controlled substance" as defined under federal law; "has been adjudicated as a mental defective or who has been committed to a mental institution"; "being an alien [] is illegally or unlawfully in the United States" (with

an enumerated exception); or "has been convicted in any court of a misdemeanor crime of domestic violence."  18 U.S.C. § 922(g)(1)–(5), (9).  If the NYSP does not identify any potentially disqualifying records, it approves the transaction and provides the seller with a "proceed" response immediately.  If any potentially disqualifying records are identified, however, the transaction is "delayed," and an NYSP examiner will further review the application and ultimately adjudicate the transaction as either a "proceed" or "deny."  If an individual receives a denial, he may appeal by first seeking from the NYSP the reason for the denial and, after receiving such information, submitting an appeal to the New York State Office of the Attorney General.

The CCIA's fee provision requires the ammunition seller to "pay a fee imposed by the [NYSP] for performing such background check."  N.Y. Exec. Law § 228(5)(a).  The fees are "allocated to the background check fund," and the "amount of the fee shall not exceed the total amount of direct and indirect costs incurred by [the NYSP] in performing [each] background check."  *Id.*  The fee is currently $2.50 per background check.

Finally, the CCIA's licensing provisions mandate all ammunition sellers who are not registered firearm dealers to register with the Superintendent.  N.Y.

7

Penal Law § 400.03(1). The licensing provisions further require that every commercial transfer of ammunition involve a licensed firearms dealer or a registered ammunition seller as an intermediary. *Id.* § 400.03(7). An ammunition seller who fails to register or involve a licensed firearms dealer or registered ammunition seller in a commercial transfer, and sells ammunition, is subject to a $1,000 fine for the first offense and may be found guilty of a class A misdemeanor for a second offense. *Id.* § 400.03(8).

The regulatory scheme went into effect on September 13, 2023. Plaintiffs sued the Superintendent that same day. The operative complaint asserts claims, pursuant to 42 U.S.C. § 1983, against the Superintendent challenging the facial and as-applied constitutionality of the CCIA's ammunition background check provisions, as well as the facial constitutionality of the fee and licensing provisions.[1]

---

[1] The Superintendent contends that Plaintiffs failed to raise an as-applied constitutional challenge. Appellee's Br. at 23 n.2. We, like the district court, construe Plaintiffs' operative complaint to adequately raise an as-applied challenge with respect to the background check provisions. *See N.Y. State Firearms Ass'n v. James*, No. 23-cv-6524 (FPG), 2024 WL 1932050, at *7 (W.D.N.Y. May 2, 2024) (concluding that "Plaintiffs are not likely to succeed on the merits of an as-applied challenge of the background check system"). For example, the operative complaint alleges that Plaintiff Dorr attempted to purchase ammunition but was unable to do so because of an operational failure in the statewide license and record database.

8

Plaintiff NYSFA is a nonprofit organization that "advocates for the protections of the right to keep and bear arms." App'x at 12. It "represents thousands of [its] members who are law-abiding citizens who own and possess firearms . . . ." *Id.* at 13. Plaintiffs Borrello and DiPietro allege that, but for the background check and associated fee, they would have purchased ammunition from licensed firearms dealers. Similarly, Plaintiff Ortman alleges that he attempted to purchase ammunition from a licensed firearms dealer on September 13, 2023, but declined to proceed with the transaction upon learning that he would have to undergo a background check and pay an associated fee imposed by the dealer. Plaintiff Dorr alleges that he attempted to purchase ammunition from two different licensed firearms dealers on September 14, 2023, but was unable to do so on either occasion because the statewide license and record database was not functioning. He alleges that, but for the system failure, he would have proceeded with the background check and purchase. He further alleges that, but for what he believes will be additional system failures, he would make future ammunition purchases. Plaintiffs also allege that, "[o]n information and belief, licensed dealers are passing [the $2.50] fee onto purchasers." App'x at 16. Further, DiPietro alleges that he would like to sell ammunition to Ortman, but would be fined $1,000 if he

engages in the transaction either without involving a licensed dealer or registered seller intermediary or himself registering with the Superintendent.

Plaintiffs moved for a temporary restraining order ("TRO") and preliminary injunction. The district court denied the TRO motion and, after receiving briefing from the parties, also denied the motion for a preliminary injunction. *See James*, 2024 WL 1932050, at *1. As an initial matter, the district court concluded that NYSFA lacked associational standing to sue on behalf of its members, but that the individual plaintiffs had standing to challenge each provision. *Id.* at *3–5. On the merits, the district court determined that Plaintiffs failed to show a likelihood of success on their Second Amendment claim because "there exists a history and tradition of background checks for ammunition, fees incident to background checks, and the requirement to involve a licensed dealer in a commercial exchange of ammunition." *Id*. at *6. This appeal followed.

## DISCUSSION

"We review the denial of a motion for a preliminary injunction for abuse of discretion, which we will identify only if the decision rests on an error of law or a clearly erroneous finding of fact, or cannot be located within the range of

10

permissible decisions." *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 102 (2d Cir. 2024) (internal quotation marks and citation omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Ordinarily, "[a] plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Id.* at 20. However, "when, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014) (alteration adopted) (internal quotation marks and citation omitted). "That is, plaintiffs must establish a clear or substantial likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (per curiam) (internal quotation marks and citation omitted).

11

I.    **Standing**

As a threshold matter, the Superintendent argues that we should affirm the denial of preliminary injunctive relief on the basis that the individual plaintiffs lack standing to sue.  We find this argument unpersuasive.

To establish standing, "a plaintiff must show [(1)] that he suffered an injury in fact that is concrete, particularized, and actual or imminent; [(2)] that the injury was likely caused by the defendant; and [(3)] that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  To establish standing at the preliminary injunction stage, a plaintiff cannot rely on mere allegations and instead must set forth, by affidavit or other evidence, specific facts, which will be taken to be true.  *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).

An injury in fact is "an invasion of a legally protected interest which is [(1)] concrete and particularized and [(2)] actual or imminent, not conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  In the context of a Second Amendment challenge to the concealed carry licensing application process, we have said that when a plaintiff "argues that a portion of the application *process* is unconstitutional," his

"injury flows from the application itself." *Antonyuk v. James*, 120 F.4th 941, 979 (2d Cir. 2024) (emphasis in original), *cert. denied*, 145 S. Ct. 1900 (2025). Thus, even if the plaintiff's "injury stems from his own unwillingness to comply with the challenged requirements," he suffers an injury-in-fact that is traceable to the defendant's allegedly unlawful conduct if it deters the plaintiff from engaging in constitutionally protected activity "due to [the plaintiff's] individual, but reasonable, sensibilities." *Id.* at 977. In such circumstances, the plaintiff "is not required to first apply for and be refused a license" to establish standing. *Id.* at 980 (emphasis omitted). These standing principles apply with equal force to a Second Amendment challenge to a background check process.

Here, Plaintiffs Borrello, DiPietro, and Ortman allege that the background check and associated fee deterred them from purchasing ammunition. Plaintiffs have plausibly alleged, and provided declarations supporting, that at least some retailers are passing the $2.50 background check fee onto the purchaser. A reasonable individual may well be deterred from engaging in what Plaintiffs allege is constitutionally protected conduct—namely, purchasing ammunition— by this fee, which is "inextricable" from the background check itself. *Id.* at 978 (concluding that the plaintiff's injury was traceable to a requirement of a licensing

13

regime, "even if he is directly deterred only by [another] requirement[]" because the two requirements are inextricably linked (emphasis omitted)).

In addition, Dorr alleges that he was denied the ability to purchase ammunition due to the operational failure of the background check database, and that he was deterred from making future purchases by the prospect of facing similar failures. Plaintiffs have also submitted declarations indicating that these failures did in fact occur on multiple days. Plaintiffs' theory of future injury is therefore not "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

Finally, DiPietro claims that he is deterred from selling ammunition to Ortman for fear of being subject to a $1,000 fine for failing to register with the Superintendent or involve a licensed dealer or registered seller in the transaction. The Superintendent argues that, under the relevant provisions, DiPietro is not required to register because he does not "engage[] in the business of purchasing, selling or keeping ammunition," and the proposed transaction does not qualify as a "commercial transfer of ammunition" requiring the involvement of a licensed dealer or registered seller. *See* N.Y. Penal Law §§ 400.03(7), 265.00(24). However,

14

in determining standing, we "are to consider whether the plaintiff's intended conduct is arguably proscribed by the challenged statute, not whether the intended conduct is in fact proscribed." *Antonyuk*, 120 F.4th at 1008 (emphases omitted) (internal quotation marks and citation omitted). Under this "forgiving standard," "if a plaintiff's interpretation of a statute is reasonable enough, and under that interpretation, the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." *Id.* (alteration adopted) (internal quotation marks and citation omitted). We, like the district court, conclude that DiPietro "[has] described a desire to engage in a course of conduct that is arguably proscribed by the statute." *James*, 2024 WL 1932050, at *5.

In short, the individual plaintiffs have established each of the standing requirements: (1) they are deterred from purchasing or selling ammunition; (2) they are "injured by the consequent inability to exercise [their alleged] Second Amendment rights," *Antonyuk*, 120 F.4th at 977; (3) "that injury is traceable to the [Superintendent's] enforcement of [the challenged] provisions," *id.*; and (4) "the injury is redressable by the injunction that [the individual plaintiffs] seek[]," *id.*

Accordingly, we conclude, as the district court did, that the individual plaintiffs have standing to challenge each of the CCIA provisions.[2]

## II.    Second Amendment Claim

On the merits, Plaintiffs argue that the district court erred in concluding they "[had] not shown a likelihood that the challenged law is unsupported by a well-established historical tradition of firearms regulation which is a requirement for success on the merits of their constitutional challenge."  *James*, 2024 WL 1932050, at *9.  However, we need not address the district court's historical analysis because we affirm on a different basis—namely, that Plaintiffs have failed to demonstrate, on this record, that the modest conditions the ammunition background check provisions impose on the commercial sale of ammunition meaningfully constrain their right to keep and bear arms.  Thus, we conclude, albeit on a different legal ground, that the district court correctly denied the preliminary injunction motion because Plaintiffs failed to demonstrate a likelihood of success on the merits.  *See*

---

2  Because we conclude that the individual plaintiffs have standing to challenge each of the CCIA provisions, we can proceed to the merits without considering whether NYSFA has standing to advance the same challenges.  *See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 826 n.1 (2002) (stating that once one plaintiff is determined to have standing, it is unnecessary for courts to address whether other plaintiffs have standing or resolve remaining standing disputes); *Horne v. Flores*, 557 U.S. 433, 446 (2009) (same).

*Name.Space, Inc. v. Network Sols., Inc.*, 202 F.3d 573, 584 (2d Cir. 2000) ("We may, of course, affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." (internal quotation marks and citation omitted)).

### A. Second Amendment Principles

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment applies to the states through the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The Supreme Court has construed the Second Amendment to guarantee an individual's "right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court prescribed a two-step framework to evaluate Second Amendment challenges. Our Court, when applying *Bruen*'s two-step framework, has explained that we ask first "whether the Second Amendment's text applies to the challenged regulation; second, if it does, we ask whether the regulation is consistent with the

17

nation's historical tradition of firearm regulation." *United States v. Vereen*, --- F.4th ----, 2025 WL 2394444, at *3 (2d Cir. Aug. 19, 2025).

Under the first step of the *Bruen* analysis, the plaintiff bears the burden of demonstrating that "the Second Amendment's plain text covers an individual's conduct"—namely, to "keep" and "bear" arms. *Bruen*, 597 U.S. at 24. When the challenged law regulates unenumerated "ancillary" conduct—such as the acquisition and maintenance of firearms and ammunition—the conduct is "only protected to the extent that [it is] necessary to the realization of the textually specified right to keep and bear arms." *Vereen*, 2025 WL 2394444, at *3 (internal quotation marks and citation omitted). Thus, "regulations on the means of acquiring, transporting, and storing firearms only implicate the text of the Second Amendment if they *meaningfully constrain* the right to possess and carry arms." *Id.* (emphasis added); *accord Gazzola v. Hochul*, 88 F.4th 186, 197 (2d Cir. 2023) (per curiam); *see also B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024) (explaining that, post-*Bruen*, the inquiry of "whether a challenged regulation meaningfully impairs an individual's ability to access firearms [] remains appropriate"), *cert. denied*, 145 S. Ct. 1958 (2025).

18

A law regulating the means of acquiring firearms and ammunition does not meaningfully constrain the right to possess arms unless it "is so restrictive that it threatens a citizen's right to acquire firearms [and ammunition]." *Gazzola*, 88 F.4th at 196 (per curiam). Mere inconveniences do not constitute such a threat. Thus, we have made clear that "gun buyers have no right to have a gun store in a particular location, nor a right to travel no more than short distances to the most convenient gun store that provides what they deem a satisfactory retail experience." *Id.* at 197–98 (internal quotation marks and citation omitted). In other words, "the Second Amendment does not elevate convenience and preference over all other considerations, nor does it guarantee a certain type of retail experience." *B & L Prods.*, 104 F.4th at 119 (alteration adopted) (internal quotation marks and citation omitted); *see also United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024) ("Nor has the [Supreme] Court held that every requirement making it slightly more difficult to possess a firearm demands a full historical inquiry into its origin."), *cert. denied*, 145 S. Ct. 1151 (2025).

Similarly, consequences that are part and parcel of ordinary regulatory measures—such as reasonable processing times and the hassle of filling out paperwork—generally will not meaningfully impair one's ability to acquire arms.

19

Indeed, because the Supreme Court has recognized that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," *Heller*, 554 U.S. at 626–27 & n.26, the modest administrative burdens that naturally follow will not ordinarily be sufficient to overcome that presumption. *See, e.g., Giambalvo v. Suffolk Cnty.*, --- F.4th ----, 2025 WL 2627368, at *12 (2d Cir. Sept. 12, 2025) (noting that background checks and firearm safety courses are presumptively constitutional even though they "necessarily require *some* amount of processing time" (emphasis in original)).

Instead, a meaningful constraint must entail a much more substantial burden. For example, we have said that a commercial sale regulation "cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Gazzola,* 88 F.4th at 196; *see also Nguyen v. Bonta*, 140 F.4th 1237, 1242 (9th Cir. 2025) (concluding that "banning the purchase of more than one firearm in a 30-day period" meaningfully constrains the ability to purchase, and thereby to keep, arms). Presumptively lawful regulations may also become constitutionally suspect if they are "put toward abusive ends." *Bruen*, 597 U.S. at 38 n.9. In addition, we have made clear that pitting an individual's Second Amendment rights against that individual's other constitutionally protected rights

may constitute a "significant burden on the right to bear arms." *Antonyuk*, 120 F.4th at 1002–03 (preliminarily enjoining the "compelled disclosure of pseudonymous social media handles" as part of a handgun licensing process because "the First Amendment protects the right to speak anonymously" (emphasis omitted)).

### B. Second Amendment Analysis

Applying those principles here, we conclude that, on this record, Plaintiffs have failed to demonstrate a likelihood of success in showing that the challenged ammunition background check provisions implicate the plain text of the Second Amendment, as required under step one of the *Bruen* framework.

New York's background check regime is no doubt a "commercial sale regulation" that imposes "conditions and qualifications" on the ammunition retailer. *Vereen*, 2025 WL 2394444, at *6 (internal quotation marks and citation omitted). It requires the retailer to conduct background checks on potential ammunition purchasers, N.Y. Penal Law § 400.03(3), imposes a small fee on the retailer for utilizing the state's background check apparatus, N.Y. Exec. Law § 228(5)(a), and penalizes the seller for failing to abide by certain strictures of the regime, N.Y. Penal Law § 400.03(8). We therefore consider whether the challenged

21

commercial ammunition regulations in the CCIA meaningfully constrain an individual's right to "keep" and "bear" arms. *See Vereen*, 2025 WL 2394444, at *3; *Gazzola*, 88 F.4th at 197; *see also Rhode v. Bonta*, 145 F.4th 1090, 1106 (9th Cir. 2025) (reviewing California's ammunition background check regime under the "meaningfully constrain" standard because it imposed "conditions and qualifications on the commercial sale of arms" (internal quotation marks and citation omitted)).

### i. Background Check Provisions

Plaintiffs principally argue that the background check requirement causes wait times that effectively prevent them from purchasing ammunition. This argument fails on both a facial and as-applied basis.

A facial constitutional challenge is the "most difficult challenge to mount successfully, because it requires a [plaintiff] to establish that no set of circumstances exists under which the [challenged provision] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (internal quotation marks and citation omitted). "That means that to prevail, the [state] need only demonstrate that [the challenged provision] is constitutional in some of its applications." *Id.* Thus, where, as here, a background check system is designed to return "a 'proceed'

response immediately" for those who are not disqualified from purchasing ammunition, App'x at 50, there are at least some circumstances in which the delay caused by the background check process is *de minimis*.  We have previously held that "a short delay does not violate an individual's Second Amendment rights" so as to rebut the presumptive validity of a challenged law.  *Giambalvo*, 2025 WL 2627368, at *12; *see also Frey v. City of New York*, --- F.4th ----, 2025 WL 2679729, at *13 (2d Cir. Sept. 19, 2025) (concluding that a permit requirement that "merely imposes a brief delay on an individual's ability to carry concealed firearms within the City . . . does not amount to constitutional harm"); *Antonyuk*, 120 F.4th at 985 n.32 (agreeing that a shall-issue permit process is "presumptively constitutional" "despite some delay occasioned by" it (internal quotation marks and citation omitted)); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 227 (4th Cir. 2024) (en banc) (rejecting an argument that "any temporary delay" constituted an infringement of Second Amendment rights), *cert. denied*, 145 S. Ct. 1049 (2025); *McRorey v. Garland*, 99 F.4th 831, 839 (5th Cir. 2024) ("Our law is plain as can be that some amount of time for background checks is permissible."); *Manney*, 114 F.4th at 1052 (rejecting an argument that "fill[ing] out the [] form or making [individuals] wait a short time while their application is processed would come

23

under [the] Second Amendment's plain text").  Accordingly, because the Second Amendment is not implicated under those circumstances, Plaintiffs are unlikely to succeed on their facial challenge to the background check.

At least at this juncture, Plaintiffs' as-applied challenge fares no better.  We have previously declined to find waiting periods of up to thirty days sufficient to constitute a "lengthy wait time[]."  *See Giambalvo*, 2025 WL 2627368, at *12 (rejecting the plaintiffs' argument that a waiting period of "more than 30 days is *per se* sufficiently lengthy to violate their Second Amendment rights"); *see also Maryland Shall Issue, Inc.*, 116 F.4th at 227 ("We decline to construe the Supreme Court's reference to 'lengthy' processing periods as including within its scope the relatively brief application, review, and approval process" of "a few days[.]"); *McRorey*, 99 F.4th at 837, 840 (concluding that "a period of 10 days does not qualify" as "lengthy" under *Bruen*).  Here, Dorr, the only plaintiff who attempted to go through the ammunition background check process, was unable to do so because the background check system was down that day.  He does not allege that the system was down in the subsequent days such that he was further denied the ability to purchase ammunition.  Dorr therefore endured a waiting period of, at

24

most, a single day.[3]  That does not come close to the "lengthy" delays under *Bruen*

as understood by our own Circuit, as well as our sister courts.[4]

In short, the modest delays reflected in the present record do not

meaningfully constrain Plaintiffs' ability to "keep" or "bear" arms.

   ii.   <u>Fee Provision</u>

Next, we conclude that Plaintiffs have failed to demonstrate that the $2.50

fee imposed on the ammunition seller to defray the cost of background checks

meaningfully constrains their Second Amendment rights.

Under *Kwong v. Bloomberg*, a government-imposed fee in the Second

Amendment context is constitutional only if the fees (1) "are designed to defray

---

[3]  Plaintiffs also seek to rely on several sworn declarations from NYSFA members showing that the state background check system was down on several other days.  The affidavits further aver that the wait times for the background check could last anywhere from three hours to nine days.  These affidavits are potentially relevant to as-applied challenges to the background check provisions based on those delays.  However, even if we consider these affidavits, our conclusion remains the same, because these affidavits do not show wait times so lengthy that they meaningfully constrain these individuals' access to ammunition.

[4]  We acknowledge that an individual may more frequently need to purchase ammunition than a firearm or undergo a licensing process.  Thus, although a brief delay during a single transaction might not, standing alone, be sufficiently lengthy, the cumulative effect of multiple delays may so significantly frustrate an individual's ability to purchase ammunition as to amount to a meaningful constraint.  Plaintiffs, however, have not plausibly alleged or averred facts to support such a theory at this juncture.

(and do not exceed) the administrative costs of regulating the protected activity,"
and (2) do not place "anything more than a marginal, incremental, or [] appreciable
restraint" on an individual's Second Amendment rights. 723 F.3d 160, 165, 167 (2d
Cir. 2013) (internal quotation marks omitted). We have continued to apply *Kwong*
after *Bruen*. *See, e.g., Giambalvo*, 2025 WL 2627368, at *10. The first requirement,
that a fee cannot exceed the administrative costs of regulation, was adopted from
"the Supreme Court's First Amendment fee jurisprudence," *Kwong*, 723 F.3d at
165, and is in no way undermined by the discussion regarding fees in *Bruen*. As
to the second requirement, *Kwong* originally asked whether the fee imposed a
"marginal [or] incremental" burden in order to determine what level of means-
end scrutiny should be applied. *Id.* at 167 (internal quotation marks and citation
omitted). To be sure, that inquisitorial purpose is no longer valid after *Bruen*. *See*
*Bruen*, 597 U.S. at 19–24 (discussing why "*Heller* and *McDonald* do not support
applying means-end scrutiny in the Second Amendment context"). However, we
still ask a substantially similar question after *Bruen*—whether the fee meaningfully
constrains an individual's right to "keep" and "bear" arms—for the purpose of
ascertaining whether the plain text of the Second Amendment is implicated. *See*
*Vereen*, 2025 WL 2394444, at *4 ("[T]he question of whether a regulation implicates

26

the text of the Second Amendment is not the kind of 'means-end scrutiny' that the Supreme Court rejected" because we do not "assess the costs and benefits of firearms restrictions nor ask whether on a case-by-case basis . . . the right is really worth insisting upon." (internal quotation marks, emphasis, and citation omitted)). Consistent with *Bruen's* plain-text inquiry, *Kwong* now teaches that a regulatory fee that is both calibrated to only defray administrative costs *and* is not prohibitively expensive does not meaningfully constrain an individual's ability to exercise his Second Amendment rights. *See id.*; *see also Bruen*, 597 U.S. at 38 n.9 (presumptively constitutional regimes may be subject to challenge if they involve "exorbitant fees").

Applying our understanding of *Kwong* to the challenged fee provision here, we conclude that Plaintiffs have failed to show a likelihood of success in demonstrating that the fee provision violates their Second Amendment rights.

As an initial matter, a facial challenge to the fee provision fails because, by law, the fee is imposed on the seller, not on purchasers like the individual plaintiffs. *See* N.Y. Exec. Law § 228(5)(a) ("Each licensed dealer . . . shall pay a fee imposed by the [NYSP] for performing [each] background check."). A seller's discretionary decision to pass that fee to the purchaser cannot be attributed as

government action.  *Cf. McRorey*, 99 F.4th at 839 ("[A] third party's legitimate discretion breaks the chain of constitutional causation." (internal quotation marks and citation omitted)).  Indeed, government regulations of all kinds impose costs, fees, and taxes on commercial businesses, including firearm and ammunition retailers.  Surely, a private retailer's economic decision, however rational, to pass on some or all of those costs to the purchaser by way of raising prices or implementing its own fees does not thereby subject each of those government regulations to a facial Second Amendment challenge by the retailer's customers.

In any event, a fee imposed on the retailer is certainly constitutional vis-à-vis the purchaser if the retailer does not pass the fee onto the purchaser.  In that case, the fee would have no impact whatsoever (not even a marginal or incremental one) on the purchaser's Second Amendment rights.  Therefore, to facially challenge a fee imposed on the retailer, a purchaser-plaintiff must show that, at a minimum, *all* retailers pass the fee onto the consumer.  Plaintiffs here do not plausibly demonstrate that all retailers pass the fee onto the purchaser.  Instead, Plaintiffs allege only that, "[o]n information and belief, licensed dealers are passing this fee onto purchasers," App'x at 16, and besides offering anecdotal evidence that *some* retailers are passing the fee onto the purchasers, submit no

evidence or articulate plausible factual allegations supporting the contention that *every* seller passes this fee onto the purchaser.

Even assuming *arguendo* that Plaintiffs could raise an as-applied challenge based upon the seller passing the fee onto them, their challenge would fail under *Kwong*. First, the fee is "designed to defray (and do[es] not exceed) the administrative costs of" implementing and operating the background check system. *Kwong*, 723 F.3d at 165. The fee provision expressly requires that the "amount of the fee shall not exceed the total amount of direct and indirect costs incurred by [the NYSP] in performing [each] background check." N.Y. Exec. Law § 228(5)(a). The Superintendent further averred that "the $2.50 fee for ammunition background transactions is not expected to exceed the costs of implementing and operating the New York State background check system." App'x at 45. Second, Plaintiffs submit no evidence, nor seriously contend, that the $2.50 fee is exorbitant or prohibitively expensive. Under *Kwong*, then, the $2.50 fee imposed on the retailer does not meaningfully constrain a purchaser's right to keep and bear arms.

In short, Plaintiffs have proffered "no evidence that [the fees] will impose such burdensome requirements . . . that they restrict protections conferred by the Second Amendment." *Gazzola*, 88 F.4th at 197.

iii.  <u>Licensing Provisions</u>

Finally, we need not dwell long on Plaintiffs' contention that the licensing provisions meaningfully constrain their right to keep and bear arms.

We do not interpret the plain text of the Second Amendment to guarantee the free-standing right to sell firearms, let alone to do so without a license or registering with state authorities. *See B & L Prods., Inc.*, 104 F.4th at 118 (stating that "the right to *sell* firearms is not a protected ancillary right" under the Second Amendment) (emphasis in original)).  To be sure, in *Gazzola*, as noted *supra*, we quoted the Tennessee Supreme Court's observation that the right to keep arms involves, among other rights, the right "to purchase *and provide* ammunition suitable for such arms."  88 F.4th at 196 (emphasis added) (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)).  However, in doing so, we did not suggest that there is a separate right to sell ammunition under the Second Amendment. Instead, we quoted that passage for the more general proposition that the government cannot effectively "circumvent" the Second Amendment's prohibitions by targeting ancillary rights. *Id.* at 195–96. Accordingly, the proposed course of conduct—to sell ammunition without first registering with the Superintendent—is not conduct independently covered by the Second

30

Amendment's text.[5]   In addition, to the extent Plaintiffs argue that such a requirement impedes the purchaser's ability to buy ammunition from a preferred source, that argument is without merit for the reasons discussed above.  *See, e.g.*, *Gazzola*, 88 F.4th at 197–98 ("It bears repeating that gun buyers have no right to have a gun store in a particular location, nor a right to travel no more than short distances to the most convenient gun store that provides what they deem a satisfactory retail experience." (internal quotation marks and citation omitted)).  Put simply, there is no evidence before us that Plaintiffs lack easy access to licensed or registered ammunition sellers.  We therefore fail to discern how the licensing provisions meaningfully constrain a purchaser's right to keep and bear arms.

*          *          *

In sum, none of the challenged provisions—individually or collectively—meaningfully constrain an individual's right to "keep" and "bear" arms so as to implicate the plain text of the Second Amendment.  Because Plaintiffs have failed

---

[5]  To be sure, retailers may "have derivative standing to pursue Second Amendment claims on behalf of [its] customer base."  *Gazzola*, 88 F.4th at 195.  But under those circumstances, as in *Gazzola*, the retailer must demonstrate that the challenged regulation meaningfully constrains the *consumer's* Second Amendment right, not that it burdens the retailers' non-existent constitutional right to sell firearms.

to demonstrate that they are likely to succeed at the first step of the *Bruen* framework, we have no occasion to engage in the historical analysis at step two.

To the extent that Plaintiffs attempt to support their position by relying on the Ninth Circuit's recent decision in *Rhode v. Bonta*, 145 F.4th at 1098, affirming the district court's decision to permanently enjoin California's ammunition background check regime, we respectfully disagree with the analysis set forth in that majority opinion. There, the Ninth Circuit held that the Californian regime was facially unconstitutional because it (1) "meaningfully constrain[ed] California residents' right to keep and bear arms" in "all applications," "[g]iven the fees and delays associated with California's ammunition background check regime, and the wide range of transactions to which it applies" and (2) was not supported by any relevantly similar historical analogues. *Id.* at 1106–07, 1109–16.

To begin, we emphasize that the California and New York regimes are not the same. For example, according to the *Rhode* majority, California's regime required customers "to pay for" the background check and may have required Californians to "purchase ammunition during a specified period of time—e.g., 18 hours—after passing a background check." *Id.* at 1106–07. By contrast, the New York regime on its face does not require the customer to pay a dime (indeed, the

decision to pass the processing fee onto the customer is made solely by the individual retailers), and there is no block of time in which the customer must purchase the ammunition once the background check clears, which can be "immediate[]."[6]  App'x at 50.

More fundamentally, we disagree with the *Rhode* majority's application of both the facial challenge and meaningfully constrain standards.  As we explained above, the Supreme Court could not have been clearer that to prevail on a facial constitutional challenge, including in the Second Amendment context, the challenger must "establish that no set of circumstances exists under which the [statute] would be valid."  *Rahimi*, 602 U.S. at 693 (internal quotation marks and citation omitted).  In other words, the government need only demonstrate that the challenged law "is constitutional in *some* of its applications."  *Id.* (emphasis added).  The *Rhode* majority gives short shrift to this well-settled regime for analyzing facial

---

[6] Moreover, although not pertinent to a facial challenge (and no as-applied challenge was asserted in *Rhode*), we note that the record before the Ninth Circuit regarding California's implementation of the background check regime differs starkly from that in this case.  As the district court in that case observed, more than a hundred thousand applicants were rejected in the first few months the background check was in place, in large part due to the state's mismatched records.  *Rhode v. Bonta*, 713 F. Supp. 3d 865, 876 (S.D. Cal. 2024), *aff'd*, 145 F.4th 1090 (9th Cir. 2025).  In addition, the district court noted the thousands of potential purchasers who could not overcome the system's rejections half a year later.  *Id.* at 876–77.  The record in this case, by contrast, is bereft of such wide-scale and substantial implementation failures.

constitutional challenges by merely summing up its features and then concluding, *ipso facto*, that those qualities meaningfully constrain "in all applications."  *Rhode*, 145 F.4th at 1107; *see id.* at 1125 (Bybee, *J.*, dissenting) ("The majority has not even attempted to explain how these features necessarily impede firearm access." (alteration adopted) (internal quotation marks and citation omitted)). Furthermore, the *Rhode* majority does not explain how a background check can meaningfully constrain an individual's rights where the attendant delays are minimal.  As the *Rhode* dissent points out, the face of the California law imposes *no* delays, and the majority's reliance on "hypothetical delays[] contradicts . . . the Supreme Court's warning . . . that we avoid belaboring onerous 'hypothetical scenarios.'"  *Id.* at 1121 (Bybee, *J.*, dissenting) (internal quotation marks and citation omitted).

The only way in which the *Rhode* majority could be understood to be faithfully applying the facial challenge standard is if they believed that *any* delay or fee, however minimal, suffices to constitute a meaningful constraint, so long as it applies to all transactions statewide.  But that conclusion, as detailed above, is flatly contradicted by our Circuit's precedents, our sister courts' precedents, and, indeed, the Ninth Circuit's own precedents.  *See, e.g.*, *Giambalvo*, 2025 WL 2627368,

at *12; *Frey*, 2025 WL 2679729, at *13; *Antonyuk*, 120 F.4th at 985 n.32; *Maryland Shall Issue, Inc.*, 116 F.4th at 227; *McRorey*, 99 F.4th at 839; *Manney*, 11 F.4th at 1052; *B & L Prods.*, 104 F.4th at 119.

Accordingly, we conclude, on this record and on different bases than those relied on by the district court, that Plaintiffs are unlikely to succeed on the merits of their Second Amendment challenges.[7]  We therefore affirm the district court's order denying preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

---

[7]  We emphasize that, with respect to Plaintiffs' as-applied challenge to the ammunition background check provisions, our analysis does not foreclose the possibility that, on remand, Plaintiffs could gather and submit additional evidence to the district court in an effort to meet their burden, under the first step of the *Bruen* framework, to demonstrate that one or more aspects of the implementation of the ammunition background check provisions have meaningfully constrained their ability to "keep" or "bear" arms. Therefore, "[o]ur affirmance . . . of the district court's [holding] does not determine the ultimate constitutionality of the [state's actions], which await further briefing [and] discovery."  *Antonyuk*, 120 F.4th at 1048 n.126.